# Illinois Official Reports

## Appellate Court

---

*In re Omar F.*, 2017 IL App (1st) 171073

---

| | |
|---|---|
| Appellate Court Caption | *In re* OMAR F., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Omar F., Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-17-1073 |
| Filed<br>Rehearing denied | October 25, 2017<br>November 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-JD-1740; the Hon. Kristal Royce Rivers, Judge, presiding. |
| Judgment | Affirmed in part; reversed and remanded in part. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.<br>Justices Howse and Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1 The minor respondent, Omar F., was adjudicated delinquent for armed robbery with a firearm and, following a dispositional hearing, was sentenced to 36 months' probation with various conditions. On appeal, the respondent argues that the State failed to prove him guilty beyond a reasonable doubt and that several conditions of his probation were unreasonable and, in the alternative, violated his constitutional rights to due process and freedom of speech and association. Specifically, the respondent complains of the following conditions: (1) that he "stay away" from gangs, guns, and drugs, (2) that he remove "those" from his social media accounts, (3) that he stop associating with or interacting with anyone who is a gang member, and (4) that he not post or be in any photos posted to Facebook or other social media accounts with people if they are in gangs. The respondent also contends that section 5-715(2)(s) of the Juvenile Court Act of 1987 (or Act) (705 ILCS 405/5-715(2)(s) (West 2016)), which permitted the court to limit his contact, direct or indirect, with all gang members, is unconstitutionally vague since it fails to define "contact," does not contain a *mens rea* requirement, encompasses a broad range of legally permissible conduct, and encourages arbitrary enforcement. For the reasons that follow, we affirm in part and reverse and remand in part.

¶ 2                                          I. BACKGROUND

¶ 3 The record before us reveals the following facts and procedural history. On August 3, 2016, the State filed a petition for adjudication of wardship, charging the minor with armed robbery with a firearm (720 ILCS 5/18-2(a) (West 2014)), aggravated robbery (720 ILCS 5/18-1(b) (West 2014)), and robbery (720 ILCS 5/18-1(a) (West 2014)). The petition alleged that on August 2, 2016, while armed with a firearm, the minor respondent knowingly took property (*i.e.*, a cell phone, book bag, and laptop computer) from the person of the victim, Azeez Soberu, by use of force or threatening the imminent use of force.

¶ 4 On March 20, 2013, the minor respondent appeared for an adjudicatory hearing together with his cousin and co-respondent, Tyreese J., also a minor. The State proceeded with a joint adjudicatory hearing against both minors, at which the following relevant evidence was adduced.

¶ 5 The victim, 23-year-old Azeez Soberu, testified that he is originally from Nigeria but that he has lived in Chicago for the past six years. Soberu stated that on August 2, 2016, he was headed to a friend's birthday party, where he was supposed to play music on his laptop. Soberu averred that to get to the birthday party he took the train but mistakenly got off at the wrong stop. At about 2:40 p.m., he was near 7939 South Vernon Avenue, when he realized that he was lost and telephoned his friend. His friend told him that he was in the wrong neighborhood and texted him the correct address. Soberu stated that he typed the correct address into the GPS system on his cell phone and then, looking and listening to the GPS instructions on his cell phone and with headphones in his ears, he proceeded to walk on South Vernon Avenue toward 79th Street to catch a bus back to his friend's place. At this point, he also had his backpack with his laptop over his shoulder. Soberu testified that as he was walking, two individuals, one light-skinned and the other dark-skinned, whom he later identified as the respondent and co-respondent, approached him from the gangway between the apartments on 7939 South Vernon Avenue and walked in front of him.

¶ 6    According to Soberu, the respondent, who was covering his face with a "white rounded shirt" so that Soberu could only see his eyes, then pointed a gun and said, "get on the ground." Soberu described the gun as a "black pistol." Soberu stated that he did not get on the ground but instead gave his cell phone to co-respondent, who took it and ran off into an apartment building across the street. Soberu noticed that the respondent, who was still holding him at gunpoint, was distracted by co-respondent's movements, so he took the opportunity to punch the respondent on the side of the eye and grab for the gun. The respondent dropped the gun but continued to fight Soberu in an attempt to retrieve it. On cross-examination, Soberu stated that throughout the struggle, the respondent continued to yell at him, "give me back the gun." Soberu stated that at that point, he wanted to get to the nearest busy street, which was 79th Street, in the hope that there would be more people there and he could get help. In an effort to stop Soberu from walking away, the respondent grabbed at Soberu, tearing Soberu's shirt and pulling his backpack, which contained the laptop, to the ground. Still holding the gun, Soberu hit the respondent in the head with it. The respondent, however, refused to let go and continued to struggle with Soberu even after he was punched and started bleeding.

¶ 7    Soberu was attempting to run toward 79th Street, when he noticed the co-respondent returning from the direction of the building he had run off to. Soberu stated that the co-respondent's face was not covered at this time and that he was wearing the same clothing Soberu had seen him in at the beginning of the attack. The co-respondent approached Soberu and punched him in the left eye. Soberu said he began to bleed and could not see and was afraid he would lose consciousness. He wanted to make sure his attackers did not have the gun, so he flung the gun as far away from himself as possible.

¶ 8    Soberu testified that at this point, both the respondent and co-respondent left, so he ran to Burger King on the corner of 79th Street to call the police. Soberu stated that the entire attack lasted no more than five minutes.

¶ 9    Soberu averred that soon thereafter the police arrived and he informed them about what had happened. Police officer Arshanette Chambers told Soberu that the police would start searching the area, and she took Soberu back to Vernon Avenue where the incident took place. There, they found Soberu's backpack with the laptop inside, as well as his headphones. Soberu also found one of his shoes, which had fallen off in the struggle. Soberu testified that after picking up his belongings, he got into a police car and was driven about a block away. There, he saw the respondent sitting on the sidewalk with another police officer by him. Soberu immediately identified the respondent as the individual who attacked him with the gun. When, a few minutes later, the co-respondent walked out of a nearby building, Soberu immediately identified him as his other attacker—the one who had taken his cell phone.

¶ 10    At the adjudicatory hearing, Soberu pointed out on a map where the events occurred and also identified photographs depicting his injuries.

¶ 11    On cross-examination, Soberu explained that he lives on the north side and needed to take the red line to his friend's house. He testified that he should have gotten off the train sooner, near 47th Street, but missed his stop because the address he was initially following on his GPS had been incorrect. Although there was some confusion in Soberu's testimony as to what direction he had been walking in prior to the attack and what public transportation he had taken to end up on Vernon Avenue, Soberu affirmatively stated that after getting off a train, he boarded a bus, before telephoning his friend. Soberu was also certain that he was listening to

the GPS instructions with his headphones and walking toward 79th Street to find transportation to head back north when he was attacked.

¶ 12    On cross-examination, Soberu stated that before the attack he had never seen or met the respondent or co-respondent. He acknowledged that when he saw the respondent and co-respondent approaching him, both attempting to cover their faces with T-shirts, he did not run immediately. He stated, however, that he did not do so because he did not know what was about to happen.

¶ 13    On cross-examination, Soberu denied that he was in the neighborhood because he intended to meet a girl from a dating website. He further denied that he ever harassed, approached, or grabbed any girl. Instead, Soberu testified that he never saw any girls and that no girls were involved in the incident. He also denied that he called the police because he thought he was in trouble for beating a boy. He also denied that there was no gun and that he hit the respondent with a metal pipe.

¶ 14    Chicago police officer Arshanette Chambers next testified that at about 2:40 p.m. on August 2, 2016, together with her partner, Officer Joe Buckley, she responded to a call for an armed robbery victim at the Burger King located on 79th Street. Once there, Officer Chambers encountered Soberu, who was bleeding from his arms, sweating profusely, had a swollen head, ripped shirt, and a missing shoe. Because Soberu could not tell the police the exact location of where he was attacked, she suggested they all go for a ride in the squad car to locate it. At Vernon Avenue, they stopped and exited the vehicle, looking for the location of the attack. While walking southbound on Vernon Avenue, somewhere in the middle of the block, they encountered Soberu's backpack on the street near a car tire. Near the gangway at 7939 South Vernon Avenue, they found Soberu's shoe and a pair of white headphones.

¶ 15    Officer Chambers testified that at this point, the police received a call over the radio indicating a possible second robbery victim on Eberhart Avenue, which was only one block away. The officers drove to that location, bringing Soberu along. As soon as the officers turned the corner on Eberhart Avenue, however, Soberu pointed out the window to the respondent, who was sitting in front of a multi-flat building, bleeding from his head, and said, "that's the guy who robbed me. That's him right there." Already on the scene were Sergeant Vargas and another police unit. According to Officer Chambers, co-respondent then came out of the building in front of which the respondent was sitting, and Soberu immediately identified him as his other attacker. Both the respondent and co-respondent were arrested.

¶ 16    On cross-examination, Officer Chambers admitted that although Soberu had told her that his assailants had tried to cover their faces with their white T-shirts, she never included this fact in her incident report. Officer Chambers also acknowledged that the police never reviewed a nearby camera video. She agreed that when she first observed the respondent sitting on the sidewalk, he had significant injuries to his head. She also noticed that there were a few girls outside of the building next to where the respondent was sitting, but admitted that she never interviewed them. Officer Chambers also admitted that her incident report reflected that when she spoke to Soberu, he told her that the co-respondent "punched him in the head, at which time [respondent] ordered him to the ground at gunpoint."

¶ 17    After the State rested, the trial court heard and denied the respondent's motion for a directed finding. The defense then called Monique J., the respondent's cousin and co-respondent's sister. Monique testified that on August 2, 2016, she lived with her mother, sisters, and brothers, including the co-respondent, at 7942 South Eberhart Avenue. At about

2:40 p.m. that day, Monique and her sister, Erica, were walking back home from a gas station located at 79th Street and King Drive when a man she had never met before grabbed her left arm and asked her if she was the girl from MeetMe (a dating website). Monique identified the man as Soberu. Monique told Soberu that she was not the girl from the website, but he kept insisting that she was. Monique then started yelling "stop" and "let me go." At the same time, Erica yelled for the respondent, and the respondent came out of their home. Monique stated that the respondent never had a weapon and was not covering his face with anything. The respondent told Soberu to leave Monique alone, but Soberu refused and told the respondent to go back into the house.

¶ 18        Monique testified that Soberu eventually let her go but continued to argue with the respondent. At some point, he became angry and started pushing the respondent, and the respondent pushed him back. A fight ensued and punches were thrown, but Soberu eventually ran off, and the respondent chased him toward 79th Street and Vernon Avenue. Monique lost sight of both of them and went into her house. When, a minute later, the respondent returned, his head "was busted," there was blood all over his face, he was "turning colors," and began vomiting. She stated that Erica then called for assistance. Instead of an ambulance showing up first, however, a police sergeant pulled up and asked what was wrong with the respondent.

¶ 19        On cross-examination, Monique admitted that at the time of the incident, there were many people inside her house, including her four brothers and their friends, but only the respondent and his friend, Armani, came out when Erica called for help. She denied that co-respondent ever went outside of the building or even saw Soberu. Monique also admitted that Erica did not call for police after the respondent fought with and chased Soberu. Instead, Erica called for help only after the respondent returned injured. Monique also admitted that when the police sergeant arrived she never told him that she had been attacked or assaulted by Soberu.

¶ 20        After the attorneys were finished questioning Monique, the trial court asked her whether she ever attempted, in any way, to have the man that grabbed her arrested, detained, or spoken to by the police, and she stated that she did not. The only explanation Monique offered for failing to tell the police Soberu grabbed her after her brother and cousin were arrested in connection with the incident was that "it was not that big of a deal."

¶ 21        After closing arguments, the trial court found the respondent guilty of all three charged offenses and adjudicated him delinquent. In doing so, the court found Monique's testimony not credible and Soberu's testimony to be credible, despite the "language barrier." The trial court acknowledged that Soberu's testimony on cross-examination about what buses and trains he took prior to the incident was confusing, but stated that this confusion only added to his credibility as it showed that he "had no idea where he was."

¶ 22        On May 2, 2017, the cause proceeded to a dispositional hearing. Prior to that hearing the court reviewed the April 27, 2017, social investigation report prepared by the respondent's probation officer. Among other things, that report reflected that the respondent had three prior referrals to the juvenile court. On January 9, 2014, he was charged with armed robbery, robbery, and theft, but all of the charges were nol-prossed. On April 19, 2014, he was charged with residential burglary, burglary, knowing damage to property and criminal trespass to field/motor vehicle, but all charges were again nol-prossed. On September 8, 2015, the respondent was charged with criminal trespass to vehicles but was found not guilty. In addition, the social investigation report reflected that the respondent had two informal

adjustments: (1) on November 29, 2011, for battery and (2) on January 23, 2016, for "CTA—Unsafe Conditions/Cross Between Cars."

¶ 23 According to the social investigation report, the respondent resided with his grandmother and had done so for the majority of his life because his mother suffered from dementia and lived in a nursing home. The respondent visited with his father, even though he did not have a room at his father's house. The respondent reported that he "feels closest to his father and his older brother." He also stated that he has a good relationship with his entire family.

¶ 24 The social investigation report further reflected that at the time of the dispositional hearing, the respondent was not enrolled in any school or GED program, and had not attended school since 2016, when he attended Excel Academy for two weeks after being expelled from Perspective High School.

¶ 25 The respondent stated that he had five friends whose ages range from 18 through 20. Three of these friends have been arrested. According to the respondent, when they spend time together, they play video games and basketball and smoke marijuana. The respondent admitted that he started smoking marijuana at the age of 16 and reported that he normally smoked it every day. He stated that his "friends are gang involved" and belong to the Black Peace Stones but denied being a gang member himself. The respondent's father reported that he did not know the respondent's friends, and the respondent admitted that he does not bring his friends around his father.

¶ 26 The respondent stated that he looks up to his older brother and admires him because he has "been in the system before but has turned his life around." The respondent stated that he wanted to obtain employment and that he would like to play basketball or become a mechanic. He indicated that he was seeking employment at Peacock Warehouse in Carol Stream.

¶ 27 The social investigation report also revealed that the respondent maintained his innocence, claiming that the victim had lied at trial and that he was only protecting his cousin.

¶ 28 The probation officer concluded that the respondent was a good candidate for probation, and recommended 36 months' probation, 35 hours of community service, mandatory school/general education degree (GED) program or employment, Treatment Alternatives for Safe Communities (TASC) along with a court ordered urine analysis and "no gang, guns or drugs."

¶ 29 At the dispositional hearing, the probation officer made his recommendation. In addition, he informed the court that the respondent, who was now 18 years old, had obtained employment with Peacock Warehouse and had been working there for one week.

¶ 30 In closing, the State argued the severity of the offense, and the respondent's prior history with the juvenile system, and agreed with the probation officer's recommendation. The respondent's counsel, on the other hand, asked for a lower term of only 24 months' probation. Counsel argued that the respondent had no previous adjudications, that he lives in a stable home, and that he had expressed the desire to obtain employment and had in fact followed through on that promise. The respondent's counsel further stated that he had no disagreement with the community service, TASC, and mandatory GED or employment conditions of the probation. Counsel made no objection or comment about the probation officer's recommendation of "no gangs, guns or drugs."

¶ 31 After hearing arguments, the trial court vacated the aggravated robbery and robbery counts and sentenced the respondent only on the armed robbery with a firearm count. The court

sentenced the respondent to 36 months' probation and 35 hours' community service. The court also ordered the respondent to complete high school or trade school or get his GED, as well as participate in TASC. The court then ordered:

> "You're to stay away from gangs, guns, and drugs. You need to clear those from you social media. If you have gang members as friends, you need to stop hanging out with them.
>
> I don't want to see any pictures of you and your friends on Facebook or any other social media if those people are in gangs.
>
> I'm not sure if you're a gang member or if you're just an associate of gangs. I see and hear that there is some contradictory information. I don't care.
>
> One way or the other—I mean it would be nice if you're not a gang member—but if you are now, I can't change that. But you're going to need to change who you're hanging out with, otherwise you can get in trouble on my probation."

¶ 32    The written dispositional order, which is a standard form order, contains a checkmark next to "no gang contact or activity." The probation order entered on the same date, includes the following handwritten statement by the trial court, "no gangs, guns or drugs," and "clear social media of gangs[,] drugs." The respondent now appeals.

¶ 33                                II. ANALYSIS
¶ 34                          A. Sufficiency of Evidence
¶ 35    On appeal, the respondent first contends that the State failed to prove him delinquent beyond a reasonable doubt where the victim was impeached, testified incredibly, and was contradicted by the defense witness.

¶ 36    It is well-accepted that no person, adult or juvenile, may be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a minor respondent challenges the sufficiency of the evidence to sustain an adjudication of delinquency, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *In re Malcolm H.*, 373 Ill. App. 3d 891, 893 (2007); see also *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 22. The reasonable doubt standard applies in all criminal cases, regardless of whether the evidence is direct or circumstantial. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47.

¶ 37    In reviewing an adjudication of delinquency, a reviewing court may not substitute its judgment for that of the trier of fact on issues of witness credibility, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59; *In re H.G.*, 322 Ill. App. 3d 727, 737 (2001). The reason is that the trier of fact, who has the opportunity to hear and see the witnesses testifying, is in a better position to judge their credibility. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. For this same reason, it is "for the trier of fact to resolve conflicts or inconsistencies in the evidence." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59.

¶ 38    Moreover, in determining the guilt or innocence of the respondent, the trier of fact "need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. Rather, it is "sufficient if all the evidence taken together

satisfies the trier of fact beyond a reasonable doubt of the accused's guilt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. Moreover, the trier of fact need not disregard inferences, which flow normally from the evidence before it, nor "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. A reviewing court will not reverse the respondent's adjudication unless the evidence is so "unreasonable, improbable or unsatisfactory" that it creates a reasonable doubt of the respondent's guilt. *People v. Rowell*, 229 Ill. 2d 82, 98 (2008); *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 39    In the present case, the respondent was found guilty of armed robbery with a firearm.[1] A person commits armed robbery with a firearm when, while armed with a firearm, he knowingly takes property from the person or presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18-1(a), 18-2(a)(2) (West 2014).

¶ 40    Viewing, as we must, the evidence in the light most favorable to the State, for the reasons that follow, we find that the trial court properly adjudicated the minor respondent guilty of armed robbery with a firearm. The record reflects that at trial, the victim, Soberu, testified that he got lost on his way to a friend's birthday party and ended up in the area of 7939 South Vernon Avenue. As he was looking to his cell phone's GPS in an attempt to find his way back to public transportation that would take him back to his friend's place, Soberu was approached by the respondent and co-respondent. The respondent pointed a black pistol at Soberu and demanded that he get on the ground. The respondent gave his cell phone to co-respondent, who ran away with it. Soberu noticed that the respondent was distracted by co-respondent and used the opportunity to punch the respondent and grab for the gun. Soberu and the respondent began fighting, and Soberu, with pistol in hand, ran toward 79th Street, which was a busier street, in hope of getting help. On the way, the respondent continued to grab Soberu, pulling his backpack and tearing his shirt. In an attempt to free himself from the respondent, Soberu hit the respondent in the head with the gun, and the respondent began to bleed. When in their continued scuffle, Soberu and the respondent arrived at 79th Street, the co-respondent reappeared from a nearby building, approached Soberu, and punched him in the eye. Soberu's vision was impaired by the blow, and he was afraid he would lose consciousness, so he flung the pistol as far away as he could and continued to run toward the Burger King on the corner of 79th Street. At that point, the respondent and co-respondent ran away. After the police arrived at the scene, they drove Soberu around the neighborhood to recover his things. Later, when the police drove Soberu to a nearby street where they were hoping to speak to an individual whom they believed was another robbery victim, Soberu saw the respondent and immediately identified him as the man who had robbed him at gunpoint. Soon thereafter, Soberu also identified the co-respondent as his second attacker, after co-respondent exited the building in front of which the respondent was sitting. Under this record, taking as we must the evidence in the light most favorable to the State, we find nothing manifestly erroneous in the trial court's conclusion that the respondent committed armed robbery with a firearm.

---

[1]We note that in his brief, the respondent contends that the State failed to prove him guilty of "armed robbery, aggravated robbery, or robbery." However, the record is clear that the trial court vacated the respondent's adjudications for aggravated robbery and robbery prior to imposing disposition. Accordingly, the only adjudication properly on review is for armed robbery with a firearm.

¶ 41    The respondent, nonetheless, asserts that we should disregard the trial court's reliance on Soberu's testimony because of numerous inconsistencies in his statements at the adjudicatory hearing and in light of the alternative version of events offered by Monique. We disagree. It is the province of the trier of fact to determine witness testimony and determine credibility. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. In the present case, the trial court explicitly found Monique's testimony unreliable, particularly after she admitted that she never informed, or attempted to inform, the police about what she claimed Soberu had done to her, even after her brother and cousin were arrested. On the other hand, the trial court explicitly found Soberu to be a credible witness.

¶ 42    The respondent's assertion that Soberu's testimony is unreliable because he could not explain how he ended up in the area prior to the attack, but rather gave befuddling and inconsistent versions as to what led him there, is without merit. The trial court already rejected this argument at the adjudicatory hearing and explicitly found that any confusion in Soberu's explanation of how he ended up at 7939 South Vernon Avenue was not detrimental to his reliability, but rather added to his credibility, because it explained that he was "incredibly lost" and "had no idea where he was." This finding is entirely reasonable in light of Soberu's testimony at trial that he moved from Nigeria to Chicago only six years before, lived on the north side of the city, got off at the wrong stop, and was completely unfamiliar with the area in which he found himself.

¶ 43    The respondent nonetheless contends that Soberu's credibility is further weakened by the circumstances surrounding his identification of the respondent as his attacker. Although the respondent does not directly challenge Soberu's identification, he points out while Soberu claimed that he immediately identified the respondent as his attacker, he testified that at the beginning of the attack, both attackers had their faces covered with T-shirts. The respondent also points out that the identification took place from inside the police car, from which Soberu initially had trouble orienting himself, when attempting to recognize the exact location of the struggle. Once again, we reiterate that the credibility of Soberu's testimony was a question for the trier of fact. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. Moreover, from the evidence presented at trial, it is evident that a rational trier of fact could infer that during the several-minute-long struggle, in which the respondent continued to grapple for Soberu's backpack and clothes in an attempt to retrieve the gun and Soberu, in return, used that gun to hit the respondent in the face, Soberu would have had sufficient opportunity to observe his attacker so as to be able to recognize him minutes afterwards. What is more, Soberu described the clothing worn by his attackers, as well as testified that when he hit the respondent with the gun, the respondent began to bleed. All of these things would have aided Soberu in identifying the respondent as his assailant only minutes after the attack.

¶ 44    The respondent further contends that we should reverse the trial court's findings because Soberu was impeached on a "key issue," *i.e.*, the timing of the punch he received from co-respondent. In that respect, the respondent points out that Soberu testified that co-respondent punched him only after he had already been engaged in a fight with the respondent, and co-respondent reappeared after having taken his cell phone. On the other hand, Officer Chambers admitted on cross-examination, that in her report, she noted that Soberu told her that co-respondent punched him in the head before the respondent ordered him to the ground at gunpoint and prior to any struggle. Contrary to the respondent's position, however, we are not at liberty to substitute our judgment for that of the trier of fact on this matter. As

already noted above, it is the province of the trier of fact to resolve any conflicts in evidence, as well as any inconsistencies in witnesses' testimony. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59. Here, the trial court found Soberu's testimony as to what transpired during the attack credible. In addition, the trial court noted Soberu's "language barrier" when testifying at trial. The transcript itself contains numerous instances in which the court asked Soberu to speak more slowly so that the court could understand his testimony. Under this record, it would not have been unreasonable for the trial court to disregard any inconsistency in the police officer's report and Soberu's subsequent testimony as resulting from miscommunication between the officer and Soberu (a non-native speaker, experiencing stress from the recent attack). This is particularly true where Officer Chambers admitted on cross-examination that her incident report failed to note other information relayed to her by Soberu on their initial encounter.

¶ 45    The respondent further argues that even if we choose to defer with the trial court's credibility determination, we should nonetheless reverse his adjudication because the State failed to prove the requisite element of armed robbery with a firearm. The respondent contends that because the gun was never recovered, Soberu's testimony was insufficient to establish that the weapon used in the robbery was a firearm as defined under the statute. We disagree.

¶ 46    In *People v. Wright*, 2017 IL 119561, ¶ 76, our supreme court recently addressed what type of evidence regarding a "firearm," would be sufficient to uphold an armed robbery with a firearm conviction. Relying on *People v. Washington*, 2012 IL 107993, ¶ 6, our supreme court concluded that the testimony of a single eyewitness that a gun or pistol was used in the robbery can be sufficient to permit a rational trier of fact to conclude that a firearm was used in the offense, even where the weapon is not recovered from the scene of the crime. See *Wright*, 2017 IL 119561, ¶ 76 (holding that the testimony of witnesses that "what looked like" a black gun used in the robbery was sufficient to conclude that a firearm was used during the commission of the offense).

¶ 47    In the present case, Soberu testified that the gun the respondent used to rob him was a "black pistol." In addition, Soberu's testimony established that he had an opportunity not only to see the gun pointed at him but also hold the gun after he grabbed it from the respondent in the struggle. Viewing this evidence in the light most favorable to the State, it was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found that the respondent was armed with a firearm during the commission of the robbery. *Wright*, 2017 IL 119561, ¶ 77.

¶ 48    Accordingly, for all of the aforementioned reasons, we affirm the trial court's adjudication of the respondent delinquent for armed robbery with a firearm.

¶ 49                                    B. Probation Conditions

¶ 50    On appeal, the respondent next contends that the trial court abused its discretion in imposing certain gang-related conditions on his probation, where his crime, armed robbery with a firearm, had nothing to do with gangs or gang membership, and therefore the probation conditions were not reasonably related to his offense. In the alternative, the respondent contends that the gang-related conditions were unconstitutional as applied to him because they were overbroad and unreasonable. The respondent specifically challenges the following conditions of his probation: (1) that he "stay away" and have "no contact" with gangs and (2) that he clear and not appear in any social media posts with gang members.

¶ 51     Before addressing the merits of the respondent's claims, we must first consider the State's forfeiture argument. The State contends that the respondent has forfeited these issues for purposes of appeal by failing to object to the imposition of the gang-related probation conditions at the time of his dispositional hearing. The respondent admits that he did not object to these conditions at the trial level but, citing *In re W.C.*, 167 Ill. 2d 307 (1995), contends that an objection was unnecessary to preserve his claims for review because he is a minor and the goal of juvenile dispositional hearings is different from that of adult sentencing. In the alternative, the respondent contends that we should review his claims under the plain error doctrine.

¶ 52     It is well-accepted that to preserve a sentencing issue for appellate review, an adult offender must object both at the sentencing hearing and in a subsequent posttrial motion. *In re N.H.*, 2016 IL App (1st) 152504, ¶ 69. On the contrary, our supreme court has held that, unlike adults, minors are excused from filing a post-adjudicatory motion to preserve issues for appellate review. *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009) (citing *In re W.C.*, 167 Ill. 2d at 327). However, contrary to the respondent's position, our supreme court has made clear that to avoid forfeiture minors must nonetheless object to the claimed errors at the trial level. See *In re Samantha V.*, 234 Ill. 2d at 368 (holding that while minors are not required to file a post-dispositional motion, they must nevertheless "object at trial to preserve a claimed error for review" (citing *In re W.C.*, 167 Ill. 2d at 327)). Since the respondent here admits that he never objected to the imposition of the probation conditions at the dispositional hearing, we must determine whether he has demonstrated plain error so as to permit our review.

¶ 53     The plain error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (citing *People v. Averett*, 237 Ill. 2d 1, 18 (2010)); see also *People v. Fort*, 2017 IL 118966, ¶ 18 (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Specifically, the plain error doctrine permits "a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *Herron*, 215 Ill. 2d at 186-87); see also *Thompson*, 238 Ill. 2d at 613; see also *People v. Adams*, 2012 IL 111168, ¶ 21. In the sentencing context, this means that a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 30 (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)).

¶ 54     "The first step of plain-error review is to determine whether any error occurred." *Lewis*, 234 Ill. 2d at 43; *Thompson*, 238 Ill. 2d at 613; see also *People v. Wilson*, 404 Ill. App. 3d 244, 247 (2010) ("There can be no plain error if there was no error at all ***."). This requires "a substantive look" at the issue raised. *People v. Johnson*, 208 Ill. 2d 53, 64 (2003). We will therefore first review the respondent's claims to determine if there was any error before considering it under plain error.

- 11 -

¶ 55    Turning to the merits, we begin by noting that trial courts have broad discretion to impose probation conditions, whether expressly enumerated by statute or not, to achieve the goals of fostering rehabilitation and protecting the public. *In re J.W.*, 204 Ill. 2d 50, 77 (2003); see also *In re H.G.*, 322 Ill. App. 3d at 738. However, this wide latitude in setting conditions of probation is not boundless. *In re J.W.*, 204 Ill. 2d at 77. The court's discretion is limited by constitutional safeguards and must be reasonable. *In re J.W.*, 204 Ill. 2d at 77.

¶ 56    In determining whether a trial court's imposition of a probation condition was proper, either under an abuse of discretion standard or as impinging on the respondent's constitutional rights under a *de novo* standard of review, our supreme court has made clear that "the overriding concern is reasonableness." *In re J.W.*, 204 Ill. 2d at 78.

¶ 57    To be reasonable, a condition of probation must not be overly broad when viewed in the light of the desired goal or the means to that end. *In re J.W.*, 204 Ill. 2d at 78 (citing *In re J.G.*, 295 Ill. App. 3d 840, 843 (1998)). In other words, "[w]here a condition of probation requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad it is not reasonably related to the compelling state interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights." (Internal quotation marks and emphasis omitted.) *In re J.W.*, 204 Ill. 2d at 78.

¶ 58    Our supreme court has explained that when assessing the reasonableness of a condition of probation, it is appropriate to consider whether the restriction is related to the nature of the offense or the rehabilitation of the probationer. *In re J.W.*, 204 Ill. 2d at 79 (citing *People v. Meyer*, 176 Ill. 2d 372, 378 (1997), and *People v. Pickens*, 186 Ill. App. 3d 456, 460 (1989)). Other considerations are (1) whether the condition of probation reasonably relates to the rehabilitative purpose of the legislation, (2) whether the value to the public in imposing this condition of probation manifestly outweighs the impairment to the probationer's constitutional rights, and (3) whether there are any alternative means that are less subversive to the probationer's constitutional rights but still comport with the purposes of conferring the benefit of probation. *In re J.W.*, 204 Ill. 2d at 79 (citing *Harris*, 238 Ill. App. 3d at 582, and *In re J.G.*, 295 Ill. App. 3d at 843).

¶ 59    A probationary condition is overbroad and therefore unreasonable when there is no valid purpose for the restriction and there is no means by which the probationer may obtain exemption from the restriction for legitimate purposes. See *In re J.W.*, 204 Ill. 2d at 80-81.

¶ 60    In the present case, for the reasons that follow, we find that the conditions of probation ordering the respondent to "stay away" and have "no contact" with gangs and to remove all social media posts in which he appears with gang members were overbroad and not narrowly drawn so as to be unreasonable. *In re J.W.*, 204 Ill. 2d at 78 (citing *In re J.G.*, 295 Ill. App. 3d at 843) (to be reasonable, a condition of probation must not be overly broad when viewed in the light of the desired goal or the means to that end).

¶ 61    In coming to this decision, we first hold that, contrary to the respondent's position, the no-gang contact provision was a valid condition of probation because it was reasonably related to the respondent's rehabilitation. See *In re J.G.*, 295 Ill. App. 3d at 843 ("conditions of juvenile probation must be reasonably related to the juvenile's rehabilitation"). The Juvenile Court Act of 1987 explicitly permits the trial court to limit a juvenile respondent's gang contact. Section 5-715(2)(s) of the Juvenile Court Act of 1987 provides in relevant part:

        "(2) The court may as a condition of probation *** require that the minor:

(s) refrain from having any contact, directly or indirectly, with certain specified persons or particular types of persons, including but not limited to members of street gangs * * *." 705 ILCS 405/5-715(2)(s) (West 2016).

While the Act does not expressly permit limitations on social media, in the present world, where communication is routinely made through online social platforms, it is not a stretch of the imagination to understand "contact" as extending to an individual's online presence.

¶ 62     In the instant case, at the dispositional hearing the trial court stated that it had reviewed the social investigation report prepared by the probation officer. That report noted that the respondent had five friends, three of whom had been arrested, and that the respondent believed that some of his friends were a negative influence on his life. According to the social investigation report, the respondent stated that some of his friends were "gang involved" and that they were members of the Black Peace Stones. The respondent, however, denied being a gang member and admitted only to being "an associate" of the Black Peace Stones. Under this record, and keeping in mind that the purpose of the juvenile court is to act as a *parens patriae* to the minor in order to see through the minor's rehabilitation (*In re Jonathon C.B.*, 2011 IL 107750, ¶ 144 (citing *In re W.C.*, 167 Ill. 2d at 325-26)), we find that attempting to limit the minor respondent's contact (real or virtual) with gang members was a valid condition of probation because it was related to his rehabilitation.

¶ 63     Nonetheless, we are compelled to conclude that the probationary conditions as articulated by the trial court were overbroad and not narrowly tailored so as to be unreasonable. *In re J.W.*, 204 Ill. 2d at 78. The trial court's blanket order requiring the respondent to "stay away" from and have "no contact" with gangs and to clear and not appear in any social media posts with gang members did not contain a means by which the respondent could obtain an exception from the restrictions for legitimate purposes. There is no exclusion for people based on familial, employment, or educational relationships, and no explanation as to what type of contact (physical or online), no matter how innocuous, will result in a probation violation. This is particularly troubling where, according to the social investigation report, the respondent reported that the person he looks up to the most is his brother, who "has been in the system but has turned his life around." Accordingly, we find that in the present case, the trial court's imposition of the aforementioned gang-related conditions of probation constituted error. See *In re J.W.*, 204 Ill. 2d 50 (vacating as unconstitutional a condition of juvenile probation limiting a minor's freedom of movement because that condition, while valid as reasonably related to the offense of sexual assault, was overbroad and therefore unreasonable because it failed to make any provisions that would have permitted the minor respondent to enter the geographic area for legitimate purposes).

¶ 64     Since we find error, we must next determine whether the error rose to the level of plain error so as to permit our review. See *Fort*, 2017 IL 118966, ¶ 18. The plaintiff contends that we should review his claims under both the first and second prongs of the plain error doctrine.

¶ 65     With respect to the first prong of the plain error doctrine, the plaintiff contends that the only evidence that he had any connection with gangs came from his social investigation report, which briefly noted that several of his friends were gang members, and that he was an associate of the Black Peace Stones but not a gang member. The respondent contends that aside from this brief statement, there was no evidence anywhere in the record that he was involved with

gangs, that the crime he committed was related to gangs or gang membership, or that his social media pages had any gang-related content.

¶ 66 In addition, the respondent contends that we should consider his constitutional challenge to the probation conditions under the second prong of the plain error doctrine because such an error was so egregious that it denied him a fair dispositional hearing. *Fort*, 2017 IL 118966, ¶ 18.

¶ 67 We agree with the respondent that under the record before us the evidence of his involvement, if any, with gangs was at best closely balanced so as to constitute plain error. In that respect, we note the trial court itself acknowledged the closely balanced nature of such evidence at the dispositional hearing, stating "there is some contradictory information" as to this. Accordingly, we may review the respondent's claims under the plain error doctrine. *Fort*, 2017 IL 118966, ¶ 18.

¶ 68 Moreover, even if the evidence of the respondent's gang affiliation at the dispositional hearing is not closely balanced, for the reasons that follow, we conclude that the respondent can proceed under the second prong of plain error review because the error is so serious that it affected the integrity of the judicial process. The judicial process of permitting social rehabilitation as a condition of probation depends on evidence of the need for such social rehabilitation but also clear parameters in setting out how the rehabilitation is to proceed. Given that certain areas of Chicago are gang-infested, a blanket prohibition against contact with gangs is simply too general and overbroad to provide a juvenile with clear parameters about how to comply with the conditions of his probation. That is, if the parameters are so vague, overboard, or general that a juvenile could be inadvertently caught violating probation in a number of scenarios, including when conducting himself in a constitutionally protected manner, then the judicial process is not functioning as intended. This breakdown in the judicial process constitutes second-prong plain error. See, *e.g.*, *Lewis*, 234 Ill. 2d at 48 (applying the second-prong plain error analysis to a review of a condition of probation that was imposed in an arbitrary and unreasonable manner, so as to affect the integrity of the judicial process).

¶ 69 Proceeding with the merits, and for all of the reasons already articulated in detail above, we conclude that the imposition of the gang-related probation conditions was overly broad and therefore not exercised in a reasonable manner. We therefore vacate that portion of the trial court's order requiring the respondent to "stay away" from and have "no contact" with gangs and to clear all his social media of postings with gang members. We remand the cause so that the trial court may consider whether such restrictions are still warranted, and if so, what appropriate exceptions for familial, employment, and school contacts should be applied.

¶ 70 Since we vacate the respondent's gang-related probation conditions, we need not address the remainder of the respondent's arguments on appeal.

¶ 71                               III. CONCLUSION

¶ 72 For the aforementioned reasons, we affirm in part and reverse and remand in part.

¶ 73 Affirmed in part; reversed and remanded in part.