2019 IL App (1st) 190661

No. 1-19-0661

Opinion filed October 17, 2019

Fourth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* J.R., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 JD 60109 |
| | ) | |
| J.R., | ) | Honorable |
| | ) | Terrence V. Sharkey, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent-minor J.R. was adjudicated delinquent for robbery and sentenced to a three-year term of probation. J.R.'s probation conditions included an order that he would have no contact with street gangs, guns, or drugs. This no-gang-contact provision prohibited him from participating in any activities that furthered or promoted a function of a street gang and included restrictions on his social media usage.

¶ 2     On appeal, J.R. argues that the juvenile court's probation condition prohibiting his contact with street gangs and associated social media usage was unconstitutionally overbroad and vague.[1]

¶ 3     For the reasons that follow, we affirm the judgment of the circuit court.[2]

¶ 4                                    I. BACKGROUND

¶ 5     J.R. was charged with one count each of armed robbery, aggravated robbery, and robbery for the June 20, 2018, robbery of 16-year-old Jonathan R. in the alley outside his home.

¶ 6     According to the evidence the State presented at the October 2018 bench trial, at about 4 p.m. on the date in question, Jonathan was throwing trash into a garbage can in the alley outside his home. He planned to go shopping with his family later that day and had in his pockets his phone and the $300 he had earned from working with his father in construction. J.R., whom Jonathan recognized from school, and an unidentified male approached Jonathan. J.R. carried a bag and asked Jonathan if he wanted to buy Gucci sandals, which Jonathan asked to see. The other male stood behind J.R., had his hands in the pockets of his sweatshirt, and wore his sweatshirt hood up. Jonathan noticed the brown handle of a gun sticking out from the pocket of the other male's sweatshirt.

¶ 7     J.R. asked Jonathan what he had in his pockets, and Jonathan, to show his serious interest in the sandals, responded that he had $300, pulled the roll of bills from his pocket, and held the roll in front of his pocket. J.R. and the other male began to act suspiciously, looking in different

_____

[1]Although J.R.'s initial brief before this court included an argument that challenged the trial court's sentencing order for failing to grant him presentence credit, J.R. subsequently withdrew this argument from his appeal.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

directions. Jonathan backed away from them with his hand around his money in his pocket. Meanwhile, Jonathan's younger brother looked over the tall fence at the group in the alley but then got down from the fence and waited in the yard for Jonathan. J.R. grabbed Jonathan's hand and tried to pull it and the cash out of Jonathan's pocket. The other male put a revolver against Jonathan's ribs, said he had a gun, and told Jonathan to let go of the money. Jonathan complied, and J.R. and the other male ran away.

¶ 8    The juvenile court found that the evidence did not establish that J.R. knew about the gun before the robbery and thus ruled that he was not accountable for the use of the gun. The court found J.R. guilty only of robbery.

¶ 9    According to the social investigation report filed with the court in November 2018, J.R. told his probation officer that he had friends who were involved in street gangs. Also, J.R.'s denial of any direct involvement with street gangs was contradicted by school staff. When J.R. recently attended the church funeral of a friend who was a gang member and rapper, rival gang members "shot up" the church in broad daylight.

¶ 10    On the next court date in December 2018, the court stated that it was aware of "gang information" and Facebook photos posted by J.R. that showed him flashing gang signs and holding a gun. The court told him that these pictures were "not acceptable" and he must "deactivate, take [them] down, untag, whatever [he] need[ed] to do [because the court] want[ed] it gone." The court asked J.R.:

> "Do you understand you are basically putting a target on your own head
> by doing this? You are telling the rest of the world and the rest of these fools that

are out there, fighting over a piece of territory that does not even belong to them that you are part of something."

The court also told J.R.:

"You can do great things with your life. The problem is you don't believe in yourself when you have to run around and do these kind of things.

I understand you may live in an area where there are people who are pushing you into this, but you need to get out of it and get away. You need to learn how to say no.

*** You need to redirect [the overwhelming pain of losing a sibling] and figure out how to handle it. Handling it in the street is only going to get you killed. Putting it out there so everybody sees it is only going to get you killed. You can say, 'I can't do this because my judge will put me away in the Department of Juvenile Justice and that's where I'm gonna have to live until I'm 21 so I am not allowed to do this.' "

¶ 11   Then J.R.'s mother told the court that she had grave concerns about J.R.'s behavior and did not want him in her home. His paternal grandmother was his legal guardian at the time, and J.R. was not abiding by his curfew. He was having tremendous difficulty in school, failed to attend classes, and had been suspended. Although J.R. had blocked his mother on Facebook, she had learned from screen shots other people sent her that J.R. was communicating with someone and looking for a gun. She stated that J.R. did not come home for days, did not "care," and had no respect for authority. She explained that J.R.'s behavior worsened "because he was watching"

his older brother, who had been associated with or a member of a street gang, had been involved in the criminal justice system as a juvenile, and had died in a police shooting in 2017.

¶ 12    The juvenile court urged J.R., who was crying, to take full advantage of talking to his probation officer and placed J.R. in the evening reporting center program (ERC), an alternative to juvenile detention that supervises and counsels males five days per week and would provide mentors to talk to J.R. The following conversation occurred:

"THE COURT: *** Don't let yourself keep sliding into the hole so you end up where you don't want to be. You are in control of that. Everything is here right now. It may feel like everything is weighing down on you, but right now you are so young you could turn everything around. I want to see you on my TV running for senator, mayor, something huge. Okay?

J.R.: Yes

* * *

THE COURT: Tell me, 'I know I will be successful.'

J.R.: I know I will be successful.

THE COURT: Tell me you believe in yourself.

J.R.: I know I'm going to be successful.

THE COURT: You're going to be successful.

J.R.: Thank you.

THE COURT: Stay clear of all that negative. The only thing you want to hear out of people's mouths are positive things."

¶ 13    On the January 16, 2019, court date, the court was informed that J.R. was still not attending classes and was suspended again, this time for two weeks for fighting. He was living with his grandmother, stole money from her, and stole her car and drove it without a driver's license. He endangered her safety by leaving her windows unlocked so he could exit and enter her home at any time. He broke her rules, was noncooperative, and brought people into her home against her wishes. She informed the court that she was not willing to take J.R. home, and the court stated that, if no one in J.R.'s family could safely care for him, his only option was detention because he was not compliant with ERC.

¶ 14    J.R.'s mother, who had become his legal guardian, stated that she did not want J.R. "locked up" because she was concerned that he would come to the same end as his deceased older brother. She was concerned about having J.R. in her home with her two young daughters because he was out of control and would defy her rules in her absence by bringing males into her home. Nevertheless, she was willing to keep him home on electronic monitoring.

¶ 15    The court stated that it would release J.R. upon the request of his mother with electronic monitoring and wanted to keep him "on a very, very, very, very, very tight rope" because he would be considered an adult in three short years and the negative information before the court showed that he was on the wrong path. The court then explained to J.R. that while he was on electronic monitoring he must be in school and attend every class on time; must attend ERC every day; was not allowed to leave home except to attend school, a doctor's appointment, or a religious service; and was not allowed to bring anyone into his mother's home. The court also stated:

"I am also ordering, if it has not been previously ordered, no gang activity, no guns, no drugs. This means that you cannot participate in any activity that furthers or promotes a function of a street gang.

You cannot post, and you must clear from any social media, any photos or videos of yourself holding or displaying any guns, real or replicas, or any other weapons, any photos, videos or message promoting street gang activity, acts of violence, criminal activity, illegal drugs, or money that was illegally obtained.

This includes the display of any street gang hand signs or any insignias.

You are not allowed to possess a gun or any illegal or nonprescribed drugs."

The court explained that if J.R. violated any of these conditions, he would be placed in a juvenile detention center. J.R. confirmed that he understood these requirements and did not have any questions.

¶ 16    On February 7, 2019, the court stated that it received reports regarding J.R.'s compliance with ERC and electronic monitoring. The probation officer informed the court J.R.'s mother had reported that J.R. violated certain court restrictions by bringing people into his mother's apartment and leaving the apartment to join people in the downstairs hallway and smoke. The probation officer also stated that J.R. was not in school and was using marijuana.

¶ 17    The juvenile court continued the matter to review the file and check whether there were images on social media of J.R. involved in gang activity and guns. J.R. stated that he had removed the Facebook pictures as instructed but still needed to tell a friend to delete a picture the friend had posted.

¶ 18    On February 15, 2019, the court sentenced J.R. to three years of felony probation, *nunc pro tunc* to December 12, 2018, with 30 days of presentence custody credit. The court referred J.R. for a drug treatment evaluation and services; ordered family counseling, anger management, and grief counseling; issued a restraining order to protect the victim; ordered 40 hours of community service; assigned an education advocate; and ordered, over objection, that J.R. would remain on electronic monitoring until he began attending school. The court also ordered that J.R. would have:

> "no gang, guns, or drug contact. And by that I mean, cannot participate in any activities that furthers or promotes the function of a street gang. He cannot post, and he must clear from any social media, any photos or videos of himself holding or displaying any guns, real or replicas, or any other weapons.
>
> He must delete any photos, or videos, or messages promoting street gang activities, acts of violence, criminal activity, illegal drugs, or money that was illegally obtained. This includes the display of any street gang signs or insignias.
>
> You are not allowed to possess a gun or any illegal or nonprescribed drugs. And you must remove any tags from your social media account."

J.R. confirmed that he understood these restrictions.

¶ 19    On March 13, 2019, the court was informed that J.R. had complied with electronic monitoring, was maintaining good behavior, and was attending school and receiving good grades. Accordingly, the juvenile court vacated the order for electronic monitoring. Thereafter, J.R. filed this appeal.

¶ 20                                    II. ANALYSIS

¶ 21    J.R. argues that the juvenile court's order imposing no-gang-contact and associated social media restrictions on him was unreasonable because these probation conditions were overly broad, were vague, and infringed on his constitutional rights. He contends the challenged probation conditions failed to identify commonsense exceptions for innocuous contact or interactions that could occur at school, work, or family events. According to J.R., the court's failure to specify the type of contact that would not violate the no-gang-contact condition subjected him to an unreasonable risk of unintentionally violating his probation by simply participating at school, interacting with his classmates online, or participating in family or educational settings. He also argues that the court failed to provide guidance about the kind of social media activities that would violate the probation order. As an example, J.R. states that, if he made an innocuous post to his Facebook page but a documented gang member or Facebook friend posted a comment that used language interpreted as gang-related slang or slogans, J.R. might have violated the vague, overbroad no-contact probation condition even though he did not produce or solicit the offending comment.

¶ 22    J.R. concedes that he forfeited review of this issue because he failed to object to these terms at the disposition hearing. See *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009) (minors must object at trial to preserve a claimed error for appellate review but are not required to file a written post-adjudication motion). J.R. asks this court to review his claim for plain error because the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process.

¶ 23    The State responds that the challenged probation conditions are narrowly tailored to pass constitutional standards and reasonably related to J.R.'s rehabilitation because the court explained these conditions in detail and told J.R. exactly what they meant.

¶ 24    The plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error under specified circumstances. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 53. Under plain error review, a reviewing court may consider an unpreserved claim when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The defendant maintains the burden of persuasion under either prong of the plain error doctrine. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 53. Before a court can engage in a plain error analysis, it first must determine if any error occurred. *Id.* ¶ 54.

¶ 25    Delinquency proceedings are protective in nature with the intent to correct and rehabilitate, not to punish. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 94. In order to achieve the goals of fostering rehabilitation and protecting the public, a juvenile court has broad discretion to impose probation conditions, whether expressly enumerated by statute or not. *In re J.W.*, 204 Ill. 2d 50, 77 (2003). Furthermore, section 5-715 of the Juvenile Court Act of 1987, which sets forth probation conditions a court may impose on juvenile offenders, provides in relevant part that the

court may require a minor to "refrain from having any contact, directly or indirectly, with certain specified persons or particular types of persons, including but not limited to members of street gangs." 705 ILCS 405/5-715(2)(s) (West 2016).

¶ 26    The court's wide latitude in setting probation conditions, however, is not boundless; it is limited by constitutional safeguards and must be exercised in a reasonable manner. *In re J.W.*, 204 Ill. 2d at 77. "To be reasonable, a condition of probation must not be overly broad when viewed in the light of the desired goal or the means to that end." *Id.* at 78. This means that when a probation condition "requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad it is not reasonably related to the compelling state interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights." (Internal quotation marks omitted.) *Id.*

¶ 27    Courts assessing the reasonableness of a probation condition "consider whether the restriction is related to the nature of the offense or the rehabilitation of the probationer." *Id.* at 79. Courts also consider

> "(1) whether the condition of probation reasonably relates to the rehabilitative purpose of the legislation, (2) whether the value to the public in imposing this condition of probation manifestly outweighs the impairment to the probationer's constitutional rights, and (3) whether there are any alternative means that are less subversive to the probationer's constitutional rights, but still comport with the purposes of conferring the benefit of probation." *Id.*

Whether a condition of probation violates a probationer's constitutional rights is a question of law, and our review, therefore, is *de novo*. *People v. Burns*, 209 Ill. 2d 551, 560 (2004).

¶ 28   Before we analyze the reasonableness of the no-gang-contact and social media restrictions, we address J.R.'s argument that these restrictions were so vague that he was placed in peril of inadvertently violating the restrictions through innocuous conduct. We reject this argument. Contrary to J.R.'s characterization of the restrictions, the record establishes that the juvenile court explained the conditions in detail and told J.R. exactly what they meant. Unlike cases where the court merely told the probationer to either stay away from or avoid street gangs and to either clear, remove, or not post gang-related content on social media (*In re J'Lavon T.*, 2018 IL App (1st) 180228; *In re Omar F.*, 2017 IL App (1st) 171073), here the court explained that J.R. could not participate in any activities that furthered or promoted a function of a street gang and must delete from social media any images or messages that promoted street gang activities, including the display of any street gang signs or insignias, and remove any tags from his social media account.

¶ 29   The probation conditions at issue here are the same conditions this court reviewed in *In re J.P.*, 2019 IL App (1st) 181087, ¶¶ 24-25, and concluded were not overbroad, vague, blanket conditions. Consistent with *In re J.P.*, we reject J.R.'s assertion that the conditions are overbroad and unreasonable because the court did not specify any exceptions for innocuous contact. *Id.* ¶ 25 (juvenile court need not specify the types of conduct that would constitute "furthering or promoting the function of a gang" to meet the constitutional requirement to narrowly tailor conditions that infringe on constitutional rights). Although a restriction on a probationer's travel into a specified geographic area must provide a means by which the probationer may obtain exemption from the restriction for legitimate purposes (*In re J.W.*, 204 Ill. 2d at 81), there is no similar requirement for exemptions in the context of ordering a probationer to refrain from having any direct or indirect contact with members of street gangs.

"Due process permits a conduct prohibition to be crafted with 'flexibility and reasonable breadth, rather than meticulous specificity,' as long as it makes reasonably clear, to those it governs, what conduct it prohibits." *In re K.M.*, 2018 IL App (1st) 172349, ¶ 51 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

¶ 30      In analyzing the reasonableness of the no-gang-contact and associated social media usage restrictions, we find that the restrictions reasonably related to the nature of J.R.'s robbery offense and rehabilitation. J.R.'s mother described his overall behavior as "out of control." He failed to attend classes, was suspended from school due to fighting, and had stolen money, not only from the juvenile victim here, but also from a family member. Social media images showed him displaying guns and flashing street gang signs, and he was communicating online with someone about obtaining a gun. Although J.R. denied direct involvement with street gangs, school staff contradicted his denial. Moreover, J.R. conceded that his friends were involved in street gangs. Given the nature of the robbery at issue here, where J.R.'s companion displayed a revolver and pressed it against the ribs of the juvenile victim, removing J.R. from the negative influence of street gangs and their attendant use of violence, weapons, and criminal activity was in J.R.'s best interest and would benefit not only his rehabilitation but also his personal safety and the safety of his family members.

¶ 31      We also find that the value to the public of the no-gang-contact and social media restrictions manifestly outweighed the impact on J.R.'s constitutional rights. The restrictions were not severe because they neither forbade all of J.R.'s use of social media nor prevented him from associating, communicating, and interacting with classmates and other groups of people in activities that did not promote or further a function of a street gang. The social media restriction merely required J.R. to remove any tags from his social media account and remove any images

of him displaying guns or other weapons, street gang hand signs or insignias, and any related messages. According to the record, J.R. clearly understood the scope of this condition because he had removed all the prohibited content by his February 7, 2019, court date and was in the process of getting a friend to remove the remaining offending image.

¶ 32    The restrictions were designed to achieve the State's compelling interests to protect J.R. from destructive and antisocial influences and protect the public by preventing him from reoffending. Given the evidence of J.R.'s dangerous and deteriorating conduct, together with the juvenile court's responsibility as *parens patriae* to protect and act in the best interests of the child (*In re O.H.*, 329 Ill. App. 3d 254, 260 (2002)), the value to the public of imposing the no-gang-contact and associated social media restrictions to support and assist J.R. in successfully completing his probation manifestly outweighs the impairment to his constitutional rights. See *In re R.H.*, 2017 IL App (1st) 171332, ¶ 4 (given the State's responsibility to its juvenile probationers, the State had a compelling interest in restricting social media and related activity to protect adjudicated delinquent minor from destructive and antisocial influences and prevent reoffending).

¶ 33    Finally, we find that the juvenile court did not have alternative, less subversive means to guide J.R.'s successful completion of his probation while deterring him from "sliding into the hole" of a life dominated by violence, crime, and street gang activity. According to the record, comprehensive probation conditions were necessary because J.R.'s family refused to take him home unless they had the assistance and protection of court-imposed conditions that would restrict his conduct, where he could go, and with whom he could associate. Without the comprehensive conditions imposed by the court, J.R.'s only other option was residing in a juvenile detention facility. The record supports the court's decision that J.R. had to be kept on a

"very, very tight rope" because he would be an adult in a couple of years and the negative information before the court established that he was following the negative path chosen by his older brother, who had been involved with street gangs and crime before his violent and untimely death.

¶ 34   The court understood that J.R. lived in an area where people were pushing him into street gang or criminal activity and he did not know how to resist this pressure. Furthermore, his mother informed the court that she could not supervise or guide J.R.'s use of social media or interactions with negative people because he had blocked her from his social media account and, in her absence, allowed prohibited people into her apartment or joined them outside the apartment in the downstairs hallway to smoke. Accordingly, the no-gang-contact and social media restrictions provided necessary limits on J.R.'s conduct and social media use so that, without the destructive and antisocial influence of street gangs, he could "turn everything around" while he was still young.

¶ 35   For all these reasons, the no-gang contact and associated social media usage restrictions were reasonable, constitutionally valid, and narrowly drawn conditions. We conclude that the juvenile court exercised its broad discretion regarding J.R.'s probation conditions in a reasonable manner and did not impose unconstitutional restrictions on his exercise of fundamental constitutional rights. Because we have found no error, we hold J.R. to his forfeiture of his claim.

¶ 36                                    III. CONCLUSION

¶ 37   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 38   Affirmed.

---

**No. 1-19-0661**

---

| | |
|---|---|
| **Cite as:** | *In re J.R.*, 2019 IL App (1st) 190661 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-JD-60109; the Hon. Terrence V. Sharkey, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Katherine Jane Miller, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Veronica Calderon Malavia and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |

---