# Illinois Official Reports

## Appellate Court

---

### *In re J.P.*, 2019 IL App (1st) 181087

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.P., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. J.P., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-18-1087 |
| Filed | March 1, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-JD-2149; the Hon. Terrence V. Sharkey, Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE LAMPKIN delivered the judgment of the court, with opinion.<br>Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion. |

**OPINION**

¶ 1 Respondent-minor, J.P., was adjudicated delinquent for aggravated unlawful use of a weapon (UUW) and unlawful possession of a firearm. The trial court merged the unlawful possession count into the aggravated UUW count and sentenced respondent to three years' probation. Additionally, as part of respondent's sentence, the trial court imposed probation conditions, including school attendance, community service, individual and family counseling, no gang contact, and tattoo removal. On appeal, respondent contends the trial court's probation conditions prohibiting gang contact and requiring tattoo removal are unconstitutionally overbroad and vague. Based on the following, we affirm but remand for clarification of the trial court's probationary condition regarding tattoo removal.[1]

¶ 2                                    I. BACKGROUND

¶ 3 At the time of her arraignment, the juvenile court learned that J.P. lived with her mother, who worked at a downtown hotel, and her 17-year-old brother. J.P. had not been in school for five or six months. J.P.'s adult sister attended the arraignment because J.P.'s mother was at work. She reported that J.P. had been expelled from school and had refused to attend her alternative school. J.P.'s sister stated that J.P. had run away from home in the past, had stolen her mother's truck and handgun, had been hospitalized, and had been diagnosed with bipolar disorder. Based on that information, the trial court found an urgent and immediate necessity to hold J.P. in custody.

¶ 4 On a subsequent pretrial court date set for custodial status, J.P.'s mother was in attendance and reported that J.P. was enrolled in school, but refused to attend. J.P.'s mother stated:

> "I love my daughter very much, but she needs—she needs help. She doesn't listen. She leaves. She wants to do whatever she wants. In my house there's [*sic*] rules and she doesn't respect them. So then she needs help for alcohol and drugs. I think she needs help so that she can get into a treatment where she gets clean, like a treatment. ***. So I want, please, to help me with her."

The trial court considered placing J.P. on electronic monitoring on that date. In response, J.P.'s mother asked the court to instruct J.P. that only family members were allowed in their home. J.P.'s mother stated, "When I go to work people would come in. She's been with people that are like 18 and over." The trial court also received a "pretty significant" mental health summary. The court ultimately placed J.P. on electronic monitoring. However, less than one month later, the trial court revoked J.P.'s electronic monitoring in response to the State's motion because J.P.'s whereabouts became unknown. The court issued a juvenile arrest warrant. On the next court date, J.P.'s mother reported that J.P. had left home 10 days prior and had not returned. Approximately one month later, J.P. returned home and was taken into custody and held pending trial.

¶ 5 At trial, Chicago police officer English[2] testified that, on December 7, 2017, around 2:11 p.m., he and his partner received a request to assist their police sergeant in pursuing a stolen

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]Officer English's first name does not appear in the transcript.

vehicle. Upon arriving at the designated location, Officer English observed his sergeant's vehicle following a white minivan. When they were approximately 200 feet behind the minivan, the officers activated their emergency lights. According to Officer English, the sergeant pulled his marked police vehicle in front of the minivan and Officer English's partner parked their vehicle behind the minivan. Officer English testified that he exited his vehicle and approached the passenger side of the minivan from the rear. While approaching, Officer English observed J.P. bend over in the front passenger seat. Officer English testified that, when J.P. "popped up," he alerted his partner, who was approaching the driver's side of the minivan. The sergeant then removed J.P. from the front passenger seat, revealing a black semiautomatic handgun in plain view on the floorboard of the front passenger side. Officer English secured and recovered the handgun, which he maintained until he returned to the police station. J.P. was taken into custody and transported to the police station. Officer English further testified that he spoke to J.P. at the police station. Officer English learned that J.P. did not have a firearm owner's identification card. J.P. admitted that she brought the handgun into the minivan. Without prompting, J.P. yelled, "the gun is mine. I got in the car with it."

¶ 6    The trial court entered a finding of guilt of aggravated UUW and unlawful possession of a firearm and continued the matter for a dispositional hearing. The court additionally ordered evaluations due to concerns regarding J.P.'s chronic truancy, peer and family stressors, and mental health history. J.P. remained in detention pending the dispositional hearing.

¶ 7    J.P.'s clinical evaluation revealed she had a learning disability, having low verbal and math skills (additional testing showed she had low cognitive functioning); she had an emotional disability; and she had difficulty controlling her impulsive behavior. J.P.'s medical history demonstrated psychiatric hospitalizations and diagnoses of oppositional defiant disorder, cannabis and alcohol abuse, conduct disorder, disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, grandiose and anxious behavior, and bipolar disorder. J.P. had been noncompliant with treatment recommendations. The evaluation reported that J.P. refused to attend school, having skipped her entire freshman year of high school. When she did attend school, J.P. accumulated major rule violations for verbal arguments, physical assault of a peer, malicious destruction of property (writing "Blanca 33M" and drawing a crown in her classroom), and oppositional behavior (writing on walls, cursing at teachers, physical altercations with teachers, and marijuana use on school grounds). J.P. denied running away from home, but J.P.'s mother described the behavior as chronic since 2015. J.P. denied being a gang member but stated that she liked to spend time with Latin Kings gang members. J.P.'s brother was a member of the Two-Sixers street gang, a rival of the Latin Kings. J.P.'s mother believed J.P. was in a gang based on the crown tattoo above one of her eyebrows. J.P. initially denied having an arrest history but eventually conceded that she had been arrested four times. According to the report, J.P. "does not seem to think rules apply to her, has been reluctant to seek needed interventions, has actively resisted interventions, and refused to follow directions from her mother, teacher, and other authority figures." The evaluation listed a number of risk factors, including J.P.'s impulsivity and her association with people demonstrating antisocial attitudes. The evaluation recommended supervision for J.P., school assistance, substance abuse treatment, and a mentor.

¶ 8    The probation department completed a social investigation, adding that J.P. had been associated with the Latin Kings since she was 13 years old. The report stated that J.P. was an active member of the Latin Kings faction located between 33rd Street and Morgan Street to

24th Street and Trumbull Avenue, where she was known as "Lil Jen," according to the I-Clear system. The report indicated that J.P. was noncompliant with the rules in her home wherein she often stayed out overnight, she stole her mother's truck, and she ran away. On one occasion, J.P.'s mother attempted to stop J.P. from leaving the home, and she pushed her mother out of the way. J.P.'s brother also attempted to prevent her from leaving the home because he disliked her spending time with her gang-affiliated friends. J.P.'s mother reported involving the Department of Children and Family Services (DCFS) because J.P. brought men into the home at night. According to J.P.'s mother, J.P. became pregnant when she was 14 or 15 years old by an 18-year-old male. J.P.'s mother "forced" J.P. to terminate the pregnancy by threatening to press charges against the male.

¶ 9      At the dispositional hearing, the trial court requested recommendations. The probation officer recommended 24 months' probation, a 30-day stay of mittimus, 30 hours of community service, individual and family counseling, a Treatment Alternatives for Safe Communities (TASC) substance abuse evaluation, a psychiatric evaluation, mandatory school attendance, cooperation with a mentoring program, and "no gangs, guns, or drugs." The State agreed. J.P.'s mother requested that J.P. be given "structure" and "oversight," in addition to removal of the gang tattoo above J.P.'s eyebrow. The guardian *ad litem* (GAL) recommended that DCFS be involved in the case instead of sending J.P. home due to her risk factors and a lack of adequate supervision at home. In allocution, J.P. stated that she had "learned [her] lesson" and wanted to return home. J.P. promised to "go to school every day."

¶ 10      After considering the recommendations, the trial court concluded that J.P. was in need of supervision, continual assistance from school due to her low intellectual functioning, psychotherapy services for her impulse control issues, mental health treatment for her bipolar disorder, substance abuse treatment (noting J.P. drank and smoked marijuana on a daily basis since the age of 13 and experimented with Xanax), and an intervention to address her refusal to follow rules and attend school and her continued association with individuals exhibiting antisocial behavior, like gang members. In so doing, the trial court identified its concern that, despite denying her gang membership, J.P. admitted she had associated with the Latin Kings since she was 13 years old and J.P. had three tattoos, including a five point crown above her left eyebrow, which "[her] mother is specifically asking me to do something about."[3] The court noted that J.P. was listed as an active Latin King member, with the nickname "Little Jen," on the I-Clear database and lived with her brother, who was a rival Two-Six gang member. The trial court additionally identified J.P.'s tendency to stay out of the home overnight without permission, even pushing her mother aside when she attempted to prevent her from leaving. Moreover, despite J.P.'s mother filing numerous missing persons reports, J.P. continued to run away from home. The court further noted that J.P. brought males home without permission when her mother was either not at home or asleep despite having become pregnant and terminating the pregnancy when she was 14. The trial court mentioned J.P.'s learning disability and failure to complete eighth grade or attend high school due to self-described concerns with rival peer groups or other gang members. In addition, the court highlighted J.P.'s five prior hospitalizations for substance abuse and mental health issues. The court advised that J.P. was "in need of a lot of assistance from the system in order to help her be a

---

[3]The other tattoos included the word "blessed" on J.P.'s right inside forearm and a scorpion on her left inner wrist.

better person and *** to survive into adulthood." The court warned that J.P. could not survive on her current path.

¶ 11    Ultimately, on May 17, 2018, the juvenile court imposed three years' of felony probation and made J.P. a ward of DCFS due to her refusal to comply with her mother's rules. A 30-day stay of mittimus was ordered (time considered served), along with 50 hours of community service, individual and family counseling, and a TASC evaluation. In addition, J.P. was instructed to take her medications as prescribed, to join a mentoring program, and to attend school regularly. The court ordered J.P. "not to have any gang activities, no guns or drugs." The court explained:

> "[W]hen I say no gangs, guns, or drug activities, [J.P.], that means you cannot participate in any activity that further[s] or promotes the function of a street gang. You cannot post, and must clear from any social media, any photos or videos of yourself holding or displaying any guns, real or replicas, or any other weapons. You must delete any photos, videos, or messages promoting street gang activity, acts of violence, criminal activity, illegal drugs, or money that was illegally obtained.
>
> This includes the display of any street gang hand signs, or insignias, and you are not allowed to possess a gun, real or replica, or any illegal or non-prescribed drugs, and you must remove any tags from you social media account. Do you understand all that?"

J.P. responded in the positive. The court further ordered J.P. to remove "any gang tattoos, including "the tattoo over her eye," noting the removal may be "painful" but was necessary. The court explained:

> "[T]he tattoo that's hidden by your hair is the key one I want removed. I want them all removed, but that one—in the past when individuals have tattooed their face it's become very difficult to find placement jobs, and they're confronted on the street because this is in favor of a particular gang, the Latin Kings, and she could be confronted by some other gang that's not a Latin King and that would cause hardship for her."

The court additionally expressed concern that J.P.'s "family allegiance seems to be more of what's on the streets with the Latin Kings than the loving parent that she has here in court." The court concluded by advising J.P. that she could seek an alteration in her probation conditions at any time.

¶ 12    The trial court entered a written sentencing order on May 17, 2018, memorializing its findings. In relevant part, the court ordered J.P. to have "no gang contact or activity" and ordered "removal of tattoo." A probation order entered on the same date by the trial court indicated that J.P. could have "no gang, gun, drug contact" and ordered "gang tattoo removal."

¶ 13    This appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15    J.P. contends the trial court's probation conditions prohibiting gang contact and requiring removal of her tattoos were not reasonably related to her offenses or rehabilitation and were unreasonably overbroad and vague. J.P. acknowledges that she failed to object to the probation conditions at her dispositional hearing. See *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009) (although minors are not required to file postdispositional motions, they must "object at trial to

preserve a claimed error for review"). J.P., however, requests that we review her contentions under the doctrine of plain error.

¶ 16 The plain error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error under specified circumstances. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 53. Under plain error review, a reviewing court may consider an unpreserved claim when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)).

The defendant maintains the burden under either prong of plain error. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 53. Before a court can engage in a plain error analysis, it first must determine if any error occurred. *Id.* ¶ 54.

¶ 17 Turning to the merits of J.P.'s contention, we begin by noting that delinquency proceedings are protective in nature with the intent to correct and rehabilitate, not to punish. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 94. In order to achieve the goals of fostering rehabilitation and protecting the public, a juvenile court has broad discretion to impose probation conditions, whether expressly enumerated by statute or not. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 55. The legislature has established probation conditions that a court may impose on juvenile offenders pursuant to section 5-715(2) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-715(2) (West 2016)). In relevant part here, a juvenile court may require that a minor "refrain from having any contact, directly or indirectly, with certain specified persons or particular types of persons, including but not limited to members of street gangs," and that he or she "undergo a medical or other procedure to have a tattoo symbolizing allegiance to a street gang removed from his or her body." 705 ILCS 405/5-715(2)(s), (s-5) (West 2016).

¶ 18 The juvenile court's discretion in ordering probation conditions, however, is not boundless; it is limited by constitutional safeguards and must be exercised in a reasonable manner. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 55; *In re J.W.*, 204 Ill. 2d 50, 77 (2003). To be reasonable, a condition of probation must not be overly broad when viewed in light of the desired goal or the means to that end. *In re J.W.*, 204 Ill. 2d at 78. Our supreme court has advised:

> "[W]here a condition of probation requires a waiver of precious constitutional rights, the condition must be narrowly drawn; to the extent it is overbroad it is not reasonably related to the compelling state interest in reformation and rehabilitation and is an unconstitutional restriction on the exercise of fundamental constitutional rights." (Emphasis and internal quotation marks omitted.) *Id.*

A probation condition will be deemed overbroad and, therefore, unreasonable, when there is no valid purpose for the restriction and there is no means by which the probationer may obtain exemption from the restriction for legitimate purposes. *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 59. The constitutionality of a probation condition presents a question of law that we review *de novo*. *Id.* ¶ 56.

## A. Gang Activity

¶ 20 J.P. contends the trial court's probationary condition prohibiting any gang contact was invalid where it did not relate to her offenses. J.P. further contends the blanket prohibition was overbroad and unreasonable where it did not allow exceptions for legitimate purposes, such as communicating with her brother (a gang member) or her classmates. J.P. relies on *Omar F.* to support her argument that the juvenile court's condition prohibiting gang contact was unconstitutional.

¶ 21 In *Omar F.*, the trial court ordered a minor that had been adjudicated delinquent for armed robbery to "stay away from gangs, guns, and drugs," to "clear" references to those topics from his social media, to remove pictures of him with gang members from social media, and to avoid "gang contact or activity." (Internal quotation marks omitted.) *Id.* ¶¶ 31-32. On appeal, this court found that "attempting to limit the minor respondent's contact (real or virtual) with gang members was a valid condition of probation because it was related to his rehabilitation," especially where the minor denied being a gang member himself but acknowledged he had friends that were gang members. *Id.* ¶ 62. Nevertheless, this court held that the trial court's probationary conditions were overbroad and not narrowly tailored where the "blanket order" requiring the minor to "stay away" from and have "no contact" with gangs "did not contain a means by which [the minor] could obtain an exception from the restriction for legitimate purposes." *Id.* ¶ 63. This court explained that neither the "no contact" provision nor the social media restriction allowed exceptions for "people based on familial, employment, or education relationships" or included any "explanation as to what type of contact (physical or online), no matter how innocuous, will result in a probation violation." *Id.*; see also *In re J'Lavon T.*, 2018 IL App (1st) 180228, ¶¶ 15-17.

¶ 22 The State argues that this case is distinguishable from *Omar F.* and *J'Lavon T.*, which followed *Omar F.*, because the juvenile court here explicitly instructed J.P. regarding the meaning of her gang activity restriction. More specifically, the court explained that "when I say no gangs, guns, or drug activities, [J.P.], that means you cannot participate in any activity that further[s] or promotes the function of a street gang" and that J.P. could not post photographs or other material on social media displaying herself with any guns or weapons, promoting gang activity or any criminal activity, acts of violence, illegal drugs, or illegally obtained money, or displaying gang signs of any kind. Accordingly, the State insists the court entered a specific and narrow probation condition.

¶ 23 We first find that the juvenile court's gang-related restrictions on J.P.'s activity, contacts, and social media usage were valid probationary conditions because they related to her rehabilitation. According to the clinical evaluation, J.P. denied being a gang member but acknowledged that she spent time with Latin Kings members. J.P.'s mother believed J.P. was in a gang due to the crown tattoo above her eyebrow (a symbol of the Latin Kings). In addition, J.P. was found tagging school property with "Blanca 33M" and a crown (presumably in reference to the Latin Kings faction with which she associated, *i.e.*, 33rd Street and Morgan Street to 24th Street and Trumball Avenue). Moreover, the social investigation report revealed that J.P. had associated with the Latin Kings since she was 13 years old. In fact, the I-Clear system identified J.P. as an active member of the Latin Kings faction at 33rd Street and Morgan Street to 24th Street and Trumball Avenue with the nickname "Lil Jen." J.P. had been arrested on four occasions prior to the instant offenses and, when arrested in this case, she confessed to Officer English, without inquiry or prompting, that "the gun is mine. I got in the

car with it." Furthermore, J.P. was chronically truant, which, as the court noted, was due in part to her self-described concerns about rival peer groups or other gang members, and she consistently disappeared from her home without permission. Given this evidence, in concert with the juvenile court's responsibility as *parens patriae*,[4] we conclude that attempting to limit J.P.'s gang activity was a valid condition of probation because it was related to her rehabilitation. See *Omar F.*, 2017 IL App (1st) 171073, ¶ 62; *J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 14.

¶ 24    Next, we must consider whether the gang-related probationary condition, although related to J.P.'s rehabilitation, was so overbroad as to be unreasonable. The trial court's sentencing and probation orders instructed J.P. not to have any "gang contact or activity" and "no gang, gun, drug contact," accordingly. However, unlike in *Omar F.* or *J'Lavon T.*, at J.P.'s dispositional hearing, the trial court explained the meaning of its oral pronouncement of "no gangs, guns, or drug activities." The trial court explained in detail the meaning of its prohibition, announcing that J.P. was restricted from participating in "any activity that further[s] or promotes the function of a street gang" and expressly explained the social media restrictions. The trial court then asked if J.P. understood. She answered in the affirmative. Accordingly, the trial court did not merely issue a "blanket prohibition." *Cf. Omar F.*, 2017 IL App (1st) 171073, ¶ 31 (the trial court instructed the minor to "stay away from gangs, guns, and drugs," to "stop hanging out" with gang members, and to "clear" from social media any pictures of "gangs, guns, and drugs" (internal quotation marks omitted)); *J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 5 (the trial court stated that "[n]o gangs, guns or drugs" included marijuana and alcohol and restricted social media posts "related to gangs or any money that might have been attained" (internal quotation marks omitted)); see also *In re K.M.*, 2018 IL App (1st) 172349, ¶¶ 16, 25. Instead, the trial court narrowed the probation condition, thereby allowing for "innocuous" or incidental contact, such as familial and nongang-related communications with J.P.'s brother and her school peers. See *In re K.M.*, 2018 IL App (1st) 172349, ¶ 39 (to remedy the overbreadth of a probationary condition that is a "blanket probation," juvenile courts must do "some narrowing" to reflect innocuous, incidental contact or to provide exceptions for educational, familial, and employment settings).

¶ 25    We do not believe the trial court was required to spell out what would constitute "furthering or promoting the function of a gang" in order to specify and narrow the no gang contact and activity restriction. *Id.* ¶¶ 48-51 (refusing to define "gang" or to provide a specific list of gangs to avoid). "Due process permits a conduct prohibition to be crafted with 'flexibility and reasonable breadth, rather than meticulous specificity,' as long as it makes reasonably clear, to those it governs, what conduct it prohibits." *Id.* ¶ 51 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). Contrary to J.P.'s argument that the probation restricted her ability to engage in innocent conduct, the trial court was clear that its goal was to prevent J.P. from participating in the gang's nefarious activities. In sum, we conclude that the restriction on gang contact and activity in this case was not so overbroad as to be unreasonable. Because we have found no error, we need not engage in a plain error analysis.

---

[4]"The circuit court, through the doctrine of *parens patriae*, has an inherent plenary power, independent of any authority given to it by the legislature, to act solely in the best interests of the child and for his [or her] own protection." *In re O.H.*, 329 Ill. App. 3d 254, 260 (2002).

¶ 26                              B. Tattoo Removal

¶ 27        J.P. next contends that the trial court's probationary condition requiring her to remove her three tattoos was not reasonably related to her offenses or her rehabilitation. J.P. notes that the trial court's May 17, 2018, written order merely mandated "tattoo removal," while its oral order at the dispositional hearing required removal of "any gang tattoos and that includes the tattoo over her eye." J.P. argues that, without specifically addressing each tattoo and how it symbolized allegiance to a gang, if any, the probation condition in this case was overbroad. J.P. cites *In re M.P.*, 297 Ill. App. 3d 972, 976 (1998), for support.

¶ 28        In *M.P.*, this court found that the trial court's order requiring the minor to remove "any gang related tattoos" was unreasonable. *Id.* at 979. It is important to note that the probation condition of tattoo removal was not, at that time, expressly listed by the legislature. However, in 1998, the legislature added tattoo removal as an authorized probation condition. Pub. Act 90-590 (eff. Jan. 1, 1999) (adding 705 ILCS 405/5-715). Moreover, the facts in *M.P.* demonstrated that tattoo removal was an unnecessary measure of rehabilitation for that minor. *In re M.P.*, 297 Ill. App. 3d at 979. Specifically, this court stated:

> "In the present case, even though the trial court may have found that some connection existed between the condition of tattoo removal and the underlying crime because defendant was with members of his gang when he committed the crime, or that there was a connection between defendant's commission of the crime and his 'gang attitude,' the resulting condition must nonetheless be reasonable when taking into account the individual defendant. While the record reflects that defendant was heavily involved in and proud of his gang, it also reflects that defendant had other interests and talents, such as drawing, and that defendant had been complying with his curfew order and 'getting along' with his mother. Under these circumstances, a probation condition for a delinquency charge of criminal trespass to a vehicle ordering tattoo removal for this defendant was clearly an unreasonable, impermissible and completely unrelated imposition when viewed in light of the purpose of the Act to secure 'care and guidance' that will serve the 'emotional, mental, and physical welfare of the minor.' [Citation.] It is difficult to image how tattoo removal would relate to rehabilitation of defendant ***." (Emphasis omitted.) *Id.*

¶ 29        As stated, section 5-715(2)(s-5) of the Act authorizes a juvenile court to order a minor to "undergo a medical or other procedure to have a tattoo symbolizing allegiance to a street gang removed from his or her body." 705 ILCS 405/5-715(2)(s-5) (West 2016). The record reveals that J.P. has three tattoos: (1) a five point crown above her left eyebrow, (2) the word "blessed" on her right inside forearm, and (3) a scorpion on her left inner wrist. At the May 17, 2018, dispositional hearing, the trial court stated that it was ordering the removal of "any gang tattoos and that includes the tattoo over her eye," explaining:

> "[T]he tattoo that's hidden by your hair is the key one I want removed. I want them all removed, but that one—in the past when individuals have tattooed their face it's become very difficult to find placement jobs, and they're confronted on the street because this is in favor of a particular gang, the Latin Kings, and she could be confronted by some other gang that's not a Latin King and that would cause hardship for her."

In its sentencing order, the trial court ordered "removal of tattoo" and, in its probation order, ordered "gang tattoo removal." It is clear that the trial court ordered the removal of the five

point crown tattoo located above J.P.'s left eyebrow.[5] However, we cannot determine what, if any, other tattoos the court deemed "gang tattoos."

¶ 30 We find the trial court's probationary condition requiring the removal of J.P.'s crown tattoo located on her face was related to her rehabilitation. As stated, J.P. had a history of associating with the Latin Kings since she was 13, was identified as an active associate with a known nickname in the I-Clear system, admitted to being friends with Latin Kings members, had been caught drawing a crown, the presumptive Latin Kings symbol, with identifying marks linked to her faction on school property, expressed trepidation about attending school because of rival gang members, and was chronically truant and a runaway. Moreover, J.P.'s mother identified J.P. as a gang member based on her crown tattoo and expressly requested that the court order its removal. We, therefore, conclude that the trial court's probationary condition requiring the removal of J.P.'s crown tattoo located above her eyebrow was valid because it related to her rehabilitation. See *Omar F.*, 2017 IL App (1st) 171073, ¶ 62; *J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 14.

¶ 31 We further find the probationary condition ordering the removal of J.P.'s crown tattoo was not so overbroad as to be unreasonable. The trial court expressly stated that it was ordering the facial crown tattoo be removed to help J.P. avoid future hardships in gaining employment and with rival gangs. Additionally, the trial court noted that her allegiance to the Latin Kings over her family would continue to pose a threat to her livelihood. Unlike in *M.P.*, the tattoo removal was a reasonable measure of rehabilitation where J.P. had not demonstrated self-guided rehabilitation potential. See *In re M.P.*, 297 Ill. App. 3d at 979. Instead, during the course of the underlying proceedings, J.P. continued to refuse to attend school and ran away while on electronic monitoring, thus requiring her to be held in custody throughout the remaining proceedings. In sum, we conclude the trial court's probationary condition requiring the removal of the "tattoo symbolizing allegiance to a street gang," *i.e.*, the crown tattoo above J.P.'s eyebrow, was not so overbroad as to be unreasonable. See 705 ILCS 405/5-715(2)(s-5) (West 2016). Because we have found no error related to the crown tattoo, we need not engage in a plain error analysis.

¶ 32 With regard to J.P.'s two other tattoos, namely, the word "blessed" and the scorpion, we, however, find the record is unclear whether the trial court ordered their removal. We, therefore, must remand this cause to the trial court to clarify if either of the remaining two tattoos were included in the court's May 17, 2018, orders.

¶ 33                                                 III. CONCLUSION

¶ 34 We affirm the judgment of the juvenile court. We, however, remand this cause to the lower court to clarify its May 17, 2018, orders related to the removal of J.P.'s two other tattoos.

¶ 35 Affirmed and remanded.

---

[5]In her reply brief, J.P. acknowledged the assumption that the crown on her face symbolized allegiance to the Latin Kings.