# Illinois Official Reports

## Appellate Court

---

### *In re T.B.*, 2020 IL App (1st) 191041

---

| | |
|---|---|
| Appellate Court Caption | *In re* T.B., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. T.B., Respondent-Appellant). |
| District & No. | First District, Third Division<br>No. 1-19-1041 |
| Filed | March 18, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-JD-1805; the Hon. Stuart P. Katz, Judge, presiding. |
| Judgment | Affirmed in part; vacated in part. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Rebecca Cohen, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1        After a bench trial in juvenile court, 17-year-old minor-respondent T.B. was found guilty of robbery, attempted robbery, two counts of aggravated battery, and two counts of battery. Respondent was adjudicated delinquent and sentenced to one year of probation. On appeal, respondent claims the State failed to prove him guilty beyond a reasonable doubt, the probation condition of "no gang activity" was unconstitutional, and his battery conviction should be vacated under the one-act, one-crime doctrine.

¶ 2        We agree with only his last argument regarding the one-act, one-crime doctrine. We find the evidence sufficient to support the adjudication. And the prohibition on gang activity easily satisfied first amendment and due process concerns. We thus affirm in part and vacate in part.

¶ 3                                    BACKGROUND

¶ 4        In November 2018, the State filed a petition for adjudication of wardship, charging respondent with robbery, attempted robbery, two counts of aggravated battery, and two counts of battery. The gist of the State's petition was that on November 2, 2018, respondent took a cell phone from Manuel Ordonez using force and that he attempted to take a cell phone from Dennys Ordonez.

¶ 5        At trial, Dennys Ordonez testified that around noon on November 2, 2018, he and his younger brother, Manuel Ordonez, went to a Chase Bank located at 69th Street and Ashland Avenue in Chicago, Illinois. After finishing their business, Dennys and Manuel left and got into Dennys's car. However, Dennys's car would not start, so he called a tow truck. Afterwards, Dennys and Manuel walked to a bus stop located a block away at 69th Street and Paulina Street.

¶ 6        While waiting for the bus, Dennys saw two people across the street near a convenience store walking north toward Dennys and Manuel "scoping us" and "looking at [Manuel]." Dennys explained that the people were "mean-mugging me and, like, looking around and, like, actually looking into me like, in a bad way; so, like, looking kind of suspicious towards me, but they were looking more at my little brother." As a result, Dennys was "just looking around. I was aware."

¶ 7        Dennys testified that the two individuals then crossed onto the side of the street that Dennys and Manuel were on. When asked whether he "g[o]t a good look at them as they were approaching," Dennys answered in the affirmative. Dennys stated that it took the individuals 15 to 20 seconds to cross the street and that he was "looking at them the whole time." He further testified that "it was light outside and there was no traffic and there was no one around." As a result, Dennys was able to observe "what [the individuals] were wearing and everything." He explained that the person on the left was "light-skinned," "kind of, tall and skinny," and "was wearing a *** red and black jacket," and that the person on the right was "tall," "skinny," and "light-skinned" and was wearing a "navy jacket" and a "hair rag on top of their hair."

¶ 8        After the first group of two individuals crossed the street, they were joined by a second group of three people coming from the right. Asked to describe those three individuals, Dennys testified that "[t]hey were all light-skinned and tall and skinny." He observed that one person was wearing a green jacket, one person was wearing a black jacket, and one person was wearing a hoodie. Dennys testified that he observed the second group as they approached the

bus stop for "about, like, ten seconds." Dennys then made an in-court identification of respondent as one of the two individuals who came from the convenience store.

¶ 9    Once the groups merged, they approached Dennys and Manuel and surrounded them. The five individuals then "jumped" Dennys and Manuel. According to Dennys, "[o]ne of the guys from the right" punched Manuel in his chest and jaw. Dennys testified that he "went into self-defense mode" and "hit one" and then he "went back." When Dennys "went back," the five individuals "started punching everybody and then they started jumping on [Manuel] and they were asking, give me your phone, give me your phone," referring to both Dennys and Manuel. Dennys testified that three people were "on" Manuel and that he was attempting to fight off two people. He stated that, while the three individuals were stomping on Manuel, the other two were hitting him. He stated that he was "scared" for Manuel "because nothing ever like that happened to us before other than that."

¶ 10    Eventually, Manuel handed over his cell phone. The three people who had been stomping on Manuel then turned their attention to Dennys. That gave Manuel a window of opportunity to flee—which he took, running to the other side of the street to summon help. But it also left Dennys facing a five-on-one fight. However, at that moment, Dennys and Manuel saw a police car. In the unfolding chaos, Dennys attempted to flag down the officer while being beaten by the mob. Once the mob became aware an officer was nearby, the individuals ran to the right and fled down Paulina Street. All told, Dennys estimated that, from first contact to flight, the encounter lasted "about five minutes."

¶ 11    When the officers stopped, Dennys told them what happened and gave a description of the offenders. A few minutes later, Dennys and Manuel were taken by police car to an address near 68th Street and Hermitage Avenue to make an identification. According to Dennys, when they arrived, he saw a person whom he later identified in court as respondent "talking to the cops." Dennys testified that he was in the police car to make an identification, though he stated that the police did not tell him who to pick.

¶ 12    When he arrived at the location, Dennys saw the person that punched Manuel in the face, whom he later identified to the police as respondent, speaking to some officers. Dennys added that respondent was not in handcuffs when he observed the suspect, that he was five feet away when he made the identification, that it was still light outside, and that only five minutes had elapsed from the time of the incident to the identification.

¶ 13    On cross-examination, Dennys testified that he decided to take the bus after his car broke down, because it was going to take the tow truck an hour to arrive. There was a bus stop at the corner where the bank was located at 69th Street and Ashland Avenue, but he opted to walk to the stop at 69th Street and Paulina Street because "someone got jumped at 69th and Ashland." Dennys further testified that, when he got to 68th Street and Hermitage Avenue, respondent was speaking to three or four police officers.

¶ 14    Manuel Ordonez testified that on November 2, 2018, he went to a Chase Bank at 69th Street and Ashland Avenue with Dennys. After finishing, Dennys's car broke down, so they called a tow truck and then walked to a bus stop. Manuel could not recall the bus stop's location, but he explained that it was on 69th Street and was approximately a two-minute walk from the Chase Bank.

¶ 15    According to Manuel, while he and Dennys were waiting at the bus stop, they "got jumped." He explained that he was "looking north and two people came from *** north to south and two people came from my right and they surrounded us." Manuel noted that the

people who approached from the north were facing him and that they were "looking around and staring at us." Manuel testified that the individuals were "tall" and "light black" and that one of the people was "wearing a black jacket." He estimated that he observed them during their approach for "like, ten seconds."

¶ 16 Manuel explained that, as the two individuals approached, he observed two more people come from his right. Manuel testified that one of those people was medium height and was wearing a black skullcap and a blue jacket.

¶ 17 Manuel testified that the individuals eventually surrounded him and Dennys and that he was hit in his chest and jaw by one of the people who came from the north. Later, Manuel identified defendant in court as the person who punched him in the chest. Those initial blows caused Manuel to fall, at which point he "started getting beaten up by three people." As the group beat up Manuel, they demanded his cell phone. Eventually, Manuel handed his phone over. Manuel testified that, during this time, he was four feet from the attackers.

¶ 18 At that point, Manuel saw that the people who were beating him up had gone to fight Dennys. Manuel then ran to a store and asked the owner to call the police. Manuel then saw a police car. At that point, the attackers were fleeing. Manuel then spoke to police officers and gave them a description of the attackers.

¶ 19 Approximately 5 to 10 minutes later, Manuel and Dennys were taken by police car to view two possible suspects. Manuel testified that the police did not tell him who to pick, that neither suspect was in handcuffs, and that he was 15 feet away from the suspects. Manuel testified that one suspect was sitting down on the stairs leading up to a house and the second suspect was standing next to the first. Manuel told the police that the second suspect, whom he identified as respondent, was the person who punched him in the chest and face. He explained that, at the time of the identification, respondent was wearing the same clothes he wore during the attack.

¶ 20 On cross-examination, Manuel testified that he only gave a description to the police of two of the four attackers. Of the attackers he could describe, Manuel related that one "had a beanie hat and was wearing a blue jacket; and the other was tall and wore a black jacket."

¶ 21 Upon further direct examination, Manuel testified that respondent was one of the attackers he described to the police.

¶ 22 Respondent testified that on the morning of November 2, 2018, he was at home. At around noon, respondent woke up and ate breakfast. At around 1 p.m., respondent left his house. According to respondent, at some point he "turned back around" and "saw someone sitting on my porch." Asked whether he knew the person, respondent explained, "[i]t was this one boy. I don't know him. He was just sitting there." Respondent testified that the boy was talking to the police and that, while the boy and the police were speaking, he was suddenly "grabbed" by seven police offers. Thereafter, respondent discovered that the police detained him because someone had been robbed. Respondent denied participating in the robbery.

¶ 23 On cross-examination, respondent testified that he lived at 6810 South Hermitage Avenue. He explained that he left his home around 1 p.m. to go to his father's house, which was located at 66th Street and Marshfield Avenue. He testified that he turned around to go home after initially leaving because he wanted to change his shoes. He explained that he wanted to change his shoes because "he didn't like them" and that he did not like his shoes because they were dirty.

¶ 24 Respondent testified that when he got back to his home, he saw "these individuals sitting there." (The record is not clear, but the "individuals" to whom counsel was referring were probably Dennys and Manuel.) Respondent testified that he did not know the person sitting on his porch. He then testified that the police suddenly appeared out of nowhere and, without saying a word, grabbed respondent and threw him to the ground.

¶ 25 After closing argument, the circuit court then found defendant guilty on all six counts. In so ruling, the court expressly rejected respondent's alibi defense, stating, "And let me just say that [respondent's] story was just [silly], just downright silly. The State has clearly proven their case beyond a reasonable doubt."

¶ 26 Thereafter, the court sentenced respondent to one year of probation and 20 hours of community service. In addition, the court entered the following probation condition:

"[N]o gang activity; no guns; no drugs, that includes alcohol and marijuana. And to be more specific on that, this means that you cannot participate in any activity that furthers or promotes the function of a street gang. You cannot post and must clear from any social media any photos or videos of yourself holding or displaying any guns whether real or replicas or any other weapons; any photos; videos; or messages promoting street gang activity; acts of violence; criminal activity; illegal drugs or money that was illegally obtained; and this includes the display of any street gang hand signs or insignias. You are not allowed to possess a gun or any illegal or non-prescribed drugs."

¶ 27 This timely appeal followed.

¶ 28                                    ANALYSIS
¶ 29                                        I
¶ 30 Respondent first argues that the State failed to prove him guilty beyond a reasonable doubt. The constitutional safeguard of proof beyond a reasonable doubt applies to the adjudicatory stage of a juvenile delinquency proceeding just as it does in criminal court. *In re Winship*, 397 U.S. 358, 368 (1970); *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 28. In determining the sufficiency of the evidence, we ask whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002).

¶ 31 Respondent attacks the witnesses' identification of him at trial. He says the identifications were unreliable for several reasons, not the least of which is that the show-up, where Dennys and Manuel first identified him, was inherently suggestive. And because these identifications were the only evidence against him (no inculpatory statement, no contraband found on him), respondent claims the evidence was wholly insufficient.

¶ 32                                        A
¶ 33 At the outset, we consider the State's argument, however briefly made, that defendant forfeited any complaint about the show-up procedure because he did not move to suppress the evidence of the show-up identification or otherwise challenge the admissibility or constitutionality of that procedure pretrial. The State is incorrect. There is a fundamental difference between moving to suppress identification evidence obtained at a show-up procedure as a violation of due process, on the one hand, and merely arguing as a factual matter that the show-up procedure was so suggestive that the resulting identification was unreliable.

¶ 34    Suppression of evidence from trial is a constitutional remedy to deter police misconduct; in the context of a show-up identification, it is designed "to deter the police from using a less reliable [identification] procedure where a more reliable one may be available." *Neil v. Biggers*, 409 U.S. 188, 199 (1972); see also *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances *** is to deter law enforcement use of improper lineups, showups, and photo arrays ***."). The goal of the suppression remedy is to incentivize police officers to " 'guard against unnecessarily suggestive procedures.' " *Perry*, 565 U.S. at 241-42 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977)).

¶ 35    If the court finds that the officers used an unnecessarily suggestive show-up procedure—that the officers could have used a less suggestive procedure—the resulting identification will be suppressed *unless* the evidence shows that the victim's identification of the defendant at trial was reliable *independent* of that tainted show-up identification. *Braithwaite*, 432 U.S. at 112-13; *Perry*, 565 U.S. at 241 ("The due process check for reliability, *Brathwaite* made plain, comes into play only after the defendant establishes improper police conduct. The very purpose of the check, [*Brathwaite*] noted, was to avoid depriving the jury of identification evidence that is reliable, *notwithstanding* improper police conduct." (Emphasis in original.)).

¶ 36    Thus, the propriety of suppression depends on two factors: whether the defendant showed that the show-up procedure was suggestive and unnecessary and, if so, whether the state can prove, by clear and convincing evidence, that the witness's in-court identification was reliable independent of that tainted show-up identification. See *Perry*, 565 U.S. at 238-39; *Brathwaite*, 432 U.S. at 107; *Biggers*, 409 U.S. at 198-99; *United States v. Wade*, 388 U.S. 218, 241 (1967); *People v. Williams*, 118 Ill. 2d 407, 412 (1987); *People v. McTush*, 81 Ill. 2d 513, 520 (1980).

¶ 37    But what if the first prong of that test were absent from a case? What if a defendant believes that the show-up procedure was suggestive and thus unreliable, but he cannot point to things the officers did that made it *unnecessarily* suggestive? Does that mean the defendant lacks any means to challenge that evidence?

¶ 38    Of course not. To be sure, the remedy of suppression drops out of the picture, because the defendant is not alleging police misconduct. See *Perry*, 565 U.S. at 242 (defendant could not establish basis for suppression for due process violation because he did not allege improper police conduct in show-up procedure; suppression remedy's "deterrence rationale is inapposite in cases *** in which the police engaged in no improper conduct").

¶ 39    But defendants can still challenge the reliability of that evidence, just as they could challenge the reliability of any other evidence admitted against them at trial. See *id.* at 245 (refusing to expand due-process suppression remedy to show-up procedures *not* involving police misconduct and resting decision, "in large part, on our recognition that the jury, not the judge, traditionally determines the reliability of evidence"). Challenging the reliability of the evidence is thus not a question of suppression but merely a challenge to the sufficiency of the proof, something any defendant can always challenge.

¶ 40    Indeed, courts have long recognized the inherent suggestiveness of show-up procedures, no matter how properly the police acted. See, *e.g.*, *Stovall v. Denno*, 388 U.S. 293, 298 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537 (1982) (noting "dangers and unfairness inherent in" show-up identifications); *Wade*, 388 U.S. at 229 ("It is obvious that risks of suggestion attend either [lineups or show-ups] and increase the dangers inhering in eyewitness identification."); *People v. Manion*, 67 Ill. 2d 564, 569 (1977) ("showups are not

favored and are even condemned"); *People v. Blumenshine*, 42 Ill. 2d 508, 512 (1969) ("A showing by police of a suspect standing alone, in what is often described as a 'show-up,' has been observed to carry with it a dangerous degree of improper suggestion.").

¶ 41 Here, as the State notes, respondent did not move to suppress the evidence of the two witnesses' show-up identifications. But that did not preclude him from challenging the reliability of those identifications and thus the overall sufficiency of the proof against him at trial. And just as he was not precluded from that challenge at trial, he is not precluded from that challenge on appeal; a defendant never forfeits the right to challenge the sufficiency of the evidence on appeal. *People v. Spencer*, 347 Ill. App. 3d 483, 487 (2004); *People v. Hall*, 194 Ill. App. 3d 532, 535 (1990) (challenge to sufficiency of evidence is "exception to the waiver rule").

¶ 42 So we find no forfeiture. We will not use that two-part test applicable to suppression; we will not determine whether the officers' use of the show-up procedure was justified or necessary. Instead, we will consider the reliability of the show-up procedure merely as part of the overall challenge to the reliability of the identifications and, thus, the sufficiency of the evidence.

¶ 43                                                              B

¶ 44 When a conviction relies on eyewitness testimony, we ultimately determine the reliability of that testimony as we would review other evidence—whether, drawing all reasonable inferences in the State's favor, a fact finder could have accepted the testimony as true beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). We consider the totality of the evidence and consider the following five factors: (1) the witness's opportunity to view the suspect, (2) the witness's degree of attention, (3) the accuracy of any prior descriptions provided, (4) the witness's level of certainty at the time of the identification procedure, and (5) the length of time between the crime and the identification. *Biggers*, 409 U.S. at 199; *In re N.A.*, 2018 IL App (1st) 181332, ¶ 22. We will consider each factor.

¶ 45 The first factor, the witness's opportunity to view respondent, favors the State. Dennys testified that he observed respondent and a confederate for 15 to 20 seconds as they approached the bus stop from across the street, it was light out, respondent's face was not obscured by a hood or anything else, and there was minimal pedestrian and vehicular traffic to obscure his view of respondent. There was nothing obstructing his view as he watched them approach.

¶ 46 True, his attention was later divided between respondent and his cohort, headed straight toward him, and the three other individuals approaching from his right, but that leaves the 15 to 20 seconds of time during which Dennys claimed to have been watching respondent every step of the way. Likewise, Manuel testified that respondent and his confederate were "staring at us" and that he observed them for approximately 10 seconds as they approached. Given their unobstructed view in broad daylight as respondent and his partner approached the witnesses, this first factor clearly favors the State. See *People v. Herrett*, 137 Ill. 2d 195, 200 (1990) (identification reliable, despite dim lighting conditions from two feet away after only "a few seconds" of observation).

¶ 47 The second factor, the witnesses' degree of attention, likewise favors the State. Dennys was not just casually observing respondent; he was immediately wary of him and watched him with suspicion. He testified that, as respondent and his confederate approached from across the street, he was able to assess respondent's demeanor—he was "mean-mugging" Dennys and

Manuel, "looking kind of suspicious towards me"—as well as the specific direction of his gaze—namely, at Manuel, who ultimately was the first one attacked. Likewise, Manuel, the younger brother, testified that he paid attention to respondent and his partner as they approached him because they were "staring at us."

¶ 48   It is one thing to have the opportunity to see a certain individual; it is another to see someone whom you immediately identify as homing in on you, particularly (as Dennys testified) in a menacing manner. We recognize again that, at some point, other individuals approached from the witnesses' right, but the witnesses saw respondent and his friend first, and their attention was fully on respondent, for at least enough time for Dennys to make those observations about respondent's suspicious and menacing stare. This second factor favors the State.

¶ 49   As to the third factor, we cannot evaluate the accuracy of the description that Dennys and Manuel gave to the police that precipitated respondent's detention and arrest. No police officer testified at trial, and neither witness gave detailed testimony about what they told the officers who searched for the offenders. This factor favors neither party.

¶ 50   As to the fourth factor, the witnesses' level of certainty at the time of the identification procedure, there is nothing in the record to suggest that either witness ever wavered in their description. This factor favors the State.

¶ 51   The fifth factor, the length of time between the crime and the identification, obviously favors the State strongly. Dennys and Manuel identified respondent mere blocks and mere minutes after the robbery occurred. The temporal and spatial closeness between the observations and ultimate identifications lend additional credence to Dennys's and Manuel's testimony.

¶ 52   And to all of this, we would add that this is not a case involving identification by a single witness. Two different witnesses identified respondent. This is not a mere numbers game alone, but there is no denying that a multiple-witness identification case is stronger than a single-identification one. So this is not a case where only Dennys's testimony satisfied the five-factor test or only Manuel's did so; each of their identifications, individually, did so.

¶ 53                                         C

¶ 54   All of that being said, we must additionally consider that each witness identified respondent in a show-up; that is, they were driven to a location close to the scene to identify two suspects who were being detained by the police. And we are mindful of the long-recognized risks associated with show-up identifications.

¶ 55   For one, once a witness has identified an individual in any pretrial identification procedure, "he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial." (Internal quotation marks omitted.) *Wade*, 388 U.S. at 229. And for another, there is the risk that a witness identifying a defendant at trial may be subconsciously remembering the defendant not from the crime scene but from the later (potentially suggestive) show-up procedure. See *Simmons v. United States*, 390 U.S. 377, 383-84 (1968). So that makes an inquiry into the show-up procedure all the more critical.

¶ 56   We have already mentioned above the inherent suggestiveness of any show-up procedure. See *Manion*, 67 Ill. 2d at 569; *Blumenshine*, 42 Ill. 2d at 512; *Stovall*, 388 U.S. at 298; *Wade*,

388 U.S. at 229. It is one thing to show a witness a more traditional in-station lineup, where a number of individuals who presumably resemble one another are placed together, with no particular person singled out by the police. But when only one suspect, on the street, is shown to the witness, the risk that the police have stamped their imprimatur on this individual (through no fault of the officer) is high. It is thus inevitable that at least some degree of suggestiveness will be present, through no fault of the police.

¶ 57   But respondent says that his show-up went beyond even the obvious suggestiveness inherent in a show-up, for two reasons. First, the brothers were together when they each identified respondent. And second, they identified respondent while he was with another suspect.

¶ 58   These are both valid bases for concern. The viewing of the suspect by two witnesses simultaneously is not ideal; "a separate viewing would have been the better practice." *People v. Rodriguez*, 387 Ill. App. 3d 812, 832 (2008). In *Rodriguez*, we did not find undue influence from the simultaneous eyewitness identification, because one of the three eyewitnesses did not identify the defendant, while two others did, so it seemed readily apparent that the three witnesses did not unduly influence or pressure one another. *Id.* Nor did the simultaneous identification by two witnesses lead to a finding of suggestiveness in *People v. Ramos*, 339 Ill. App. 3d 891, 898 (2003), though we said little about the topic. So respondent is correct to identify this problem, but it is by no means an automatically fatal one by itself.

¶ 59   Respondent is also correct to complain that he was shown to the witnesses while standing with another suspect. Our supreme court has noted "the danger of suggestion, by association" with this practice. *Blumenshine*, 42 Ill. 2d at 512.

¶ 60   But those points notwithstanding, we cannot agree that the evidence of identification is so shaky and unreliable as to warrant reversal. First and foremost in our consideration is how quickly the witnesses identified respondent following the attack. The two witnesses closely watched respondent as he approached them on the street (Dennys more so than Manuel) and then, only minutes after the robbery, while events were obviously still fresh in their minds, they identified respondent. No matter how suggestive the officers' actions may have been— and we have little to go on here, only the mere fact that the witnesses identified respondent together, while respondent stood with another suspect—it is hard to imagine that the two witnesses' identifications, so immediately after the attack, could have been so tainted that we could not find their identifications reliable.

¶ 61   And we add another point about the timing. Though courts have long noted some of the problems with show-up procedures, one of the benefits of an identification procedure taking place so quickly after an attack is that a potential suspect would have little opportunity to alter anything about his or her appearance. In a lineup taking place days or weeks (or more) after the attack, the witness probably would not see suspects in the same clothes they were wearing and perhaps in a different style or length (or color) of hair. The witness may be able to identify the suspects by their faces or builds, but not their clothes, and perhaps not even their hair.

¶ 62   But in a show-up taking place almost contemporaneously with the attack, a witness has more tools for his identification than just face and build. The witness can consider such things and clothes and hair. Here, for example, Dennys mentioned not just the build and complexion of the two people who first approached him head-on, but also what they were wearing—one a red and black jacket, the other a navy jacket and a hair rag on his head. (Dennys never specified

which of these two was respondent, but one of them was.) So he had those additional data points to confirm his identification.

¶ 63 Thus, taking the facts in the light most favorable to the State, we find the identifications more than sufficiently reliable, whatever the flaws in the show-up procedure used by the officers. We thus find the evidence sufficient to support the adjudications against respondent.

¶ 64                                                                II

¶ 65 We next consider respondent's challenge to the probation condition imposed by the circuit court. Again, the court placed the following restriction on respondent:

> "*[N]o gang activity*; no guns; no drugs, that includes alcohol and marijuana. And to be more specific on that, this means that *you cannot participate in any activity that furthers or promotes the function of a street gang*. You cannot post and must clear from any social media any photos or videos of yourself holding or displaying any guns whether real or replicas or any other weapons; any photos; videos; *or messages promoting street gang activity*; acts of violence; criminal activity; illegal drugs or money that was illegally obtained; and this includes the *display of any street gang hand signs or insignias*. You are not allowed to possess a gun or any illegal or non-prescribed drugs." (Emphases added.)

¶ 66 As a general matter, there are two grounds on which juveniles may challenge a probation condition. They may challenge the condition on reasonableness grounds—that there is no reasonable connection between the condition and the particulars of the juvenile's offense or other circumstances, such that the probation condition does not further the goal of rehabilitation. See *In re Jawan S.*, 2018 IL App (1st) 172955, ¶ 16. Or they may claim the condition violates the constitution for one reason or another. See, *e.g.*, *id.* ¶ 25; *In re J.W.*, 204 Ill. 2d 50, 80-82 (2003).

¶ 67 Respondent most certainly raises the second, constitutional challenge. The first challenge? It is less clear. Respondent's opening brief says nothing about the general reasonableness of the probation condition. But in his reply brief, respondent raises a genuine reasonableness argument, claiming that the record lacks any evidence that respondent "had any connection with gangs," that he engaged in "any gang-related activity" whatsoever, or that "this crime was gang-related." Thus, says respondent, the no-gang-activity condition "was not justified by [respondent's] specific rehabilitative needs" and was "unreasonable."

¶ 68 Generally, an argument raised for the first time in the reply brief is deemed forfeited. *In re Marriage of Winter*, 2013 IL App (1st) 112836, ¶ 29; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). But we deem it appropriate to consider this argument for several reasons. First, forfeiture is a limitation on the parties, not this court. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33. And we have a duty to avoid constitutional questions where possible. *People v. White*, 2011 IL 109689, ¶ 148. Considering the reasonableness of the probation condition is a nonconstitutional issue that could potentially allow us to avoid the constitutional question. And third, respondent did at least mention in his opening brief that he had no prior involvement with gangs, when discussing the constitutionality of the restrictions placed on him; this idea is not coming entirely out of the blue. So we will first consider the reasonableness of the probation condition and, only if necessary, will then turn to the constitutional challenge.

¶ 69 We must also confront a more fundamental forfeiture issue. Respondent did not object to the probation condition on either ground in the circuit court and thus may only seek relief under the plain-error doctrine. Under the second prong of that doctrine, we may reverse a probation condition if the imposition of that condition affects respondent's substantial rights and impugns the integrity of the judicial system. See *In re K.M.*, 2018 IL App (1st) 172349, ¶¶ 41-42. Since the first step in the plain-error analysis is to determine whether an error occurred in the first place, we turn to the merits of respondent's arguments.

¶ 70                                                        A

¶ 71 We start with the reasonableness of the no-gang-activity restriction. Again, respondent argues that he had no history of gang affiliation in his background and, thus, any restriction on gang activity is not reasonably related to his rehabilitation. We review the probation condition for an abuse of discretion; we will not overturn the condition unless it is so arbitrary or unreasonable that no reasonable person would impose that condition. *Jawan S.*, 2018 IL App (1st) 172955, ¶ 16.

¶ 72 The purpose of delinquency proceedings is to protect and rehabilitate, not punish, the minors. *In re D.S.*, 198 Ill. 2d 309, 328 (2001); *Jawan S.*, 2018 IL App (1st) 172955, ¶ 16. Juvenile courts possess the power of *parens patriae*, the power and, indeed, the "duty to act in the best interests of the minor and for the minor's own protection." *In re D.S.*, 198 Ill. 2d at 328; see 705 ILCS 405/5-101(1) (West 2018) (one purpose of juvenile court system is to "equip juvenile offenders with competencies to live responsibly and productively").

¶ 73 The court is thus given "wide discretion to impose conditions of probation (whether expressly authorized by the juvenile-probation statute or not), as long as they are consistent" with the Act's "protective and rehabilitative aims." *Jawan S.*, 2018 IL App (1st) 172955, ¶ 16. Generally, a juvenile-probation condition will not be deemed unreasonable if it has some connection either to the specific crime committed or to the "behavior or attitude," more generally, that needs "adjusting" if the probationer is to rehabilitate. (Internal quotation marks omitted.) *Id.*; see *In re J.W.*, 204 Ill. 2d at 79; *In re R.H.*, 2017 IL App (1st) 171332, ¶ 17.

¶ 74 While respondent argues that his record reveals no history of gang affiliation, the State argues that his background is not as clear in that regard. For one thing, we need look no further than the facts of this case; respondent did not commit this crime alone but with several other boys. In the risk assessment conducted for the court, respondent identified "people he surrounds himself with" and "old friends *** that were bad influences and caused him to get in trouble." He was also the recent victim of a shooting, suffering a wound that has since healed. To that, we would add that respondent has an intellectual disability and has some behavioral and mental-health issues that require medication. And there is no question that respondent lives in a neighborhood where street gangs are prevalent.

¶ 75 Does that sound like a young man who might be susceptible to the influences of a street gang? The juvenile court would be more than reasonable in believing so. And we could stop right there and find this probation condition reasonably related to respondent's rehabilitation.

¶ 76 We would make a larger point as well. As long as it is crafted to comport with the constitution (more on that below), a prohibition on engaging in gang activity strikes us as one of those prophylactic measures that would be appropriate for virtually any juvenile probationer. Minors adjudicated delinquent, by definition, are juveniles who have already strayed at least once from the path toward responsible and productive citizenship. The trial court's mission is

to put those children back on that path and keep them there. That means, in a general sense, staying out of trouble and staying in school.

¶ 77    It is not unreasonable, in that instance, for a court to take certain basic preventative measures, such as requiring school attendance, prohibiting the use of illegal drugs or alcohol, and yes, prohibiting activity with street gangs. Is it necessary that the juvenile already have a developed background related to those issues? We see no reason why that should be required. A court could reasonably require school attendance even if the juvenile had no history of truancy. A court could order a juvenile not to take drugs or alcohol even if the child had no history of substance abuse. And a court should have the discretion to prohibit gang activity even if the minor had no history of gang affiliation.

¶ 78    These children are at a crossroads. They have made at least one big mistake in their lives already. The mission of the juvenile court, as *parens patriae*, is to take whatever reasonable steps can be taken to place and keep that minor on the right path to rehabilitation. Prohibiting activity with street gangs easily falls within those preventative measures.

¶ 79    In recent years, we have invalidated several no-gang-contact restrictions as unconstitutional because they put the minor in a trick bag of sorts—it was all but impossible for the juvenile to reasonably comply with an order prohibiting any "contact" with gang members when that juvenile lived among so many gangs, and when the word "contact" covered virtually any interaction with a gang member, including good-faith, noncriminal interactions such as a school project or a "hello" at the bus stop. See, *e.g.*, *K.M.*, 2018 IL App (1st) 172349, ¶ 27 (restriction left respondent "walking on eggshells" to avoid even incidental, innocent "contact" with gang members); *In re Omar F.*, 2017 IL App (1st) 171073, ¶ 63.

¶ 80    But we never suggested that minors could not be prohibited from joining or acting with gangs. Nor did we suggest that juvenile courts were placed in some straitjacket in which only those juveniles with an established background of gang affiliation could be kept away from gangs. Indeed, in at least one decision, we stated the very opposite. See *K.M.*, 2018 IL App (1st) 172349, ¶ 20 ("we reject any implication that this discretion [to impose gang restrictions on juvenile probationers] can be exercised reasonably *only* when the minor freely admits, or the evidence otherwise proves, that he is already gang-affiliated" (emphasis in original)).

¶ 81    Such a rule would make no sense. Any troubled minor needs to be kept away from influences or factors that might cause the child to recidivate, and street gangs are at or near the top of that list of negative influences. An established history of gang affiliation should not be a prerequisite to that preventative probation restriction.

¶ 82    If we have not said it loudly enough before, we do so here: We categorically reject the notion that a juvenile court is preempted from ordering a juvenile to refrain from gang activity unless that minor's record reveals a history of gang affiliation. As long as it is crafted in a constitutional manner, a prohibition on gang activity is a prophylactic measure reasonably related to the goal of virtually any juvenile's rehabilitation.

¶ 83    We would say the same of the trial court's prohibition on respondent posting on social media any "messages promoting street gang activity" or any "displays of any street gang hand signs or insignias." If, as we have held, it is reasonable for the trial court to force respondent to steer clear of gang activity, any postings on social media that show support for such gangs or their activities would be well within the court's proper reach, too. Public, online association with or glorification of gang activity could threaten a juvenile's prospects for rehabilitation in obvious ways, not the least of which includes jeopardizing prospects for future college or

employment opportunities. See *Jawan S.*, 2018 IL App (1st) 172955, ¶ 62; *K.M.*, 2018 IL App (1st) 172349, ¶ 61. As long as such social-media prohibitions do not violate constitutional limitations, they are reasonably related to the goals of just about any juvenile's rehabilitation.

¶ 84     We thus find no abuse of discretion in the imposition of this probation condition.

¶ 85                                                    B

¶ 86     Having resolved the nonconstitutional avenue, that leaves respondent's constitutional challenges to the probation condition. There are three: vagueness, overbreadth, and a violation of the first amendment. We take them in that order. Our review of the constitutionality of a probation condition is *de novo*. *K.M.*, 2018 IL App (1st) 172349, ¶ 22.

¶ 87                                                    1

¶ 88     A vagueness challenge implicates "the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *United States v. Davis*, 588 U.S. ___, ___, 139 S. Ct. 2319, 2325 (2019) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926)). A statute is vague, and thus violates due process, when its requirements are not set forth in sufficiently clear terms "to serves as a guide to those who must comply with it." *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 291 (2003). Requiring clarity in a statute allows citizens to conform their behavior to a law without having to guess at its meaning. *Fagiano v. Police Board*, 98 Ill. 2d 277, 282 (1983). It has the added benefit of regulating governmental discretion and avoiding arbitrary or discriminatory enforcement. *People v. Plank*, 2018 IL 122202, ¶ 12.

¶ 89     This constitutional mandate applies with full force to probationers. Like a statute, a probation order must clearly apprise the probationer of what conduct is required and what conduct is prohibited. *Jawan S.*, 2018 IL App (1st) 172955, ¶ 39; *K.M.*, 2018 IL App (1st) 172349, ¶ 47.

¶ 90     Respondent discusses the vagueness doctrine but spends little time explaining what, precisely, was so confusing about the probation order that a person of ordinary intelligence would have to guess at what it means. He elaborates on how he believes the probation order went too far—and was thus overbroad—but little on vagueness. We have trouble seeing what is so hard to understand about a prohibition on "participat[ing] in any activity that furthers or promotes the function of a street gang" or in posting on social media any "messages promoting street gang activity" or "display[s] of any street gang hand signs or insignias."

¶ 91     In *In re J.R.*, 2019 IL App (1st) 190661, ¶ 18, we rejected a vagueness challenge to a probation condition that was virtually identical to this one. We likewise upheld a prohibition on "illegal gang activity" against a vagueness challenge in *Jawan S.*, 2018 IL App (1st) 172955, ¶ 49, noting that the prohibited conduct was not "generic contact" with gang members but rather gang-related behavior "specifically linked to illegal endeavors, such as drug-dealing, or theft, or acts of violence." We found it "impossible to believe" that respondent was "left to guess at what conduct is prohibited and what conduct is not." *Id.*

¶ 92     And more than once, we have rejected the notion that the term "gang" or "street gang" is so vague that a probationer would not understand its meaning. See *K.M.*, 2018 IL App (1st) 172349, ¶¶ 48-50; *In re R.H.*, 2017 IL App (1st) 171332, ¶ 34 ("The trial judge, the probation officer, and, surely, R.H. know what 'gangs' mean, and to suggest otherwise *** is

- 13 -

sophistry."); see also *United States v. Soltero*, 510 F.3d 858, 866 (9th Cir. 2007) (term "criminal street gang" was sufficiently clear to satisfy due process).

¶ 93    On the minimal argument put forth here, we find no basis for finding this probation condition unconstitutionally vague.

¶ 94                                                    2

¶ 95    Next, respondent claims the probation order is overbroad, in that it covers a substantial swath of innocent and constitutionally protected activity.

¶ 96    As noted previously, we have found probation restrictions that prohibit any "contact" with gang members to be overbroad, because they place a probationer who lives in a gang-prevalent neighborhood in a position where it is almost impossible to comply with the restriction, no matter how innocent or innocuous the "contact" with the gang member may be. See, *e.g.*, *K.M.*, 2018 IL App (1st) 172349, ¶¶ 25-28 (noting "no contact" prohibition could be violated by respondent doing nothing more than riding bus to school or working part-time alongside gang members); *Omar F.*, 2017 IL App (1st) 171073, ¶¶ 60- 63; *J'Lavon T.*, 2018 IL App (1st) 180228, ¶ 15.

¶ 97    But we have consistently distinguished those probation conditions from ones, as here, that prohibit any *activity* that promotes street gangs, because such a restriction does not reach innocuous or innocent interactions with students, coworkers, or others in the community who happen to be gang members. See, *e.g.*, *In re J.R.*, 2019 IL App (1st) 190661, ¶ 31 (restriction did not prevent respondent from "associating, communicating, and interacting with classmates and other groups of people in activities that did not promote or further a function of a street gang"); *In re J.P.*, 2019 IL App (1st) 181087, ¶ 24 (no-gang-activity restriction did not reach innocent interactions with classmates or others); *Jawan S.*, 2018 IL App (1st) 172955, ¶ 32 (prohibition on illegal gang activity was not overbroad, as it did "not prohibit the kinds of innocent, incidental contact that respondent is likely to have with gang members during the course of his ordinary daily activities").

¶ 98    As in those cases, we see nothing here that renders the probation order overbroad. Nothing prevents respondent from incidental contact with individuals who happen to be affiliated with a street gang. He is simply barred from engaging in *activities* that relate to the functions of a street gang—that is, criminal activity. The overbreadth argument fails.

¶ 99                                                    3

¶ 100   Last, respondent claims that the social-media restriction violates his rights under the first amendment. As stated, the probation condition at issue in this case restricted respondent from any social-media postings (past or future) that "promot[e] street gang activity" or involving "the display of any street gang hand signs or insignias."

¶ 101   The restriction was thus a content-based speech regulation, "since it regulates his speech based on 'the topic discussed or the idea or message expressed.' " *K.M.*, 2018 IL App (1st) 172349, ¶ 57 (quoting *Reed v. Town of Gilbert*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227 (2015)). Ordinarily, that would pose a serious problem for the State, because "content-based restrictions are highly disfavored, [are] subject to strict scrutiny, and must be narrowly tailored to serve compelling state interests." *Id.*

¶ 102    But the rules are different for probationers. *Id.* "Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." (Internal quotation marks omitted.) *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). "Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled." ' " *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin*, 483 U.S. at 874, quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). "[T]he need to supervise a probationer, foster his rehabilitation, and protect the public permit[s] a court to impose restrictions on his constitutionally protected freedoms that would not be reasonable to impose on the public at large." *K.M.*, 2018 IL App (1st) 172349, ¶ 57. And we add to that the fact that respondent is a minor. Due to their special vulnerabilities, minors do not enjoy the full protection of constitutional rights as adults. *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality opinion); *K.M.*, 2018 IL App (1st) 172349, ¶ 57; *R.H.*, 2017 IL App (1st) 171332, ¶ 20.

¶ 103    Thus, strict scrutiny does not apply to juvenile probation conditions that impinge on constitutional rights. Instead, we have explained, "probation conditions that restrict the exercise of constitutional rights are considered 'narrowly tailored' as long as they 'reasonably relate' to the probationary goal of rehabilitation." *K.M.*, 2018 IL App (1st) 172349, ¶ 57 (quoting *J.W.*, 204 Ill. 2d at 78).

¶ 104    Given the ubiquity of social media, particularly among younger citizens, "restrictions on its use are indispensable to the goal of rehabilitation." *K.M.*, 2018 IL App (1st) 172349, ¶ 54. "If the juvenile court has any hope of steering [an adolescent] toward a new direction and productive life, it would be absurd to target only real-world behavior and ignore online activity." *R.H.*, 2017 IL App (1st) 171332, ¶ 26.

¶ 105    The social-media restrictions here obviously relate to the goal of the juvenile's rehabilitation. Respondent has already committed one violent offense for which he has been spared detention. His "public association with illegal activity—online or otherwise—poses a clear threat to his prospects for rehabilitation and a successful, productive life." *Jawan S.*, 2018 IL App (1st) 172955, ¶ 62 (upholding similar social-media ban against first amendment challenge). As noted earlier, among other things, social-media postings that promote or glorify gang activity could have a negative effect on opportunities for higher education or future employment. See *id.*; see also *K.M.*, 2018 IL App (1st) 172349, ¶ 61 (upholding similar social-media restriction, as "a juvenile probationer's continued public association with gangs or illegal activity, online or otherwise, poses a clear threat to his rehabilitation and any positive, productive ambitions he may have in life").

¶ 106    We agree that it is possible to conceive of scenarios where respondent might post a message or image with gang signs in a way intended to convey a positive message, such as a message to *avoid* gangs. But we do not require perfection in these probation orders; a minor infringement on his first-amendment rights "is an entirely reasonable price to ask [respondent] to pay for his liberty." *K.M.*, 2018 IL App (1st) 172349, ¶ 60.

¶ 107    Thus, just as the probation order was not vague or overbroad, it likewise did not violate the first amendment.

¶ 108                                              III

¶ 109    We next consider respondent's argument that his adjudications for simple battery to Dennys and Manuel should be vacated under the one-act, one-crime doctrine, because those

- 15 -

adjudications were based on the same conduct as respondent's adjudications for aggravated battery. The State has conceded error, and we accept the State's concession.

¶ 110 Initially, we note that respondent forfeited this issue by failing to raise it below. But as the State correctly notes, one-act, one-crime violations may be raised as second-prong plain error, because they implicate the integrity of the judicial system. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010).

¶ 111 "The one-act, one-crime rule prohibits convictions for multiple offenses that are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 13. Here, counts II and V of the petition for wardship, charging respondent with aggravated battery, differ from the simple battery counts (III and VI) only in that the aggravated-battery counts allege that the battery occurred on the public way. Both sets of counts involve the same physical act. As such, respondent's convictions under counts III and VI for simple battery must be vacated.

¶ 112                                    CONCLUSION

¶ 113 We vacate respondent's convictions for simple battery. The judgment of the circuit court is affirmed in all other respects.

¶ 114 Affirmed in part; vacated in part.

- 16 -